CALLOWAY, J., Pro Tempore.
| iDuring the last year of his life, Joseph Robert Cook (“Joseph”) executed a will leaving the entirety of his estate to his daughter, Elizabeth. Dianne Cook (“Dianne”), and in the alternative, his housekeeper. His sons, Robert Cook (“Robert”) and David Cook (“David”), filed suit to invalidate the will on the grounds of undue influence by Dianne. Finding clear and convincing evidence of undue influence by Dianne over her father, the trial court invalidated the will. Dianne now appeals. Because we find no manifest error in the trial court’s findings of fact and because we find the evidence of undue influence to be clear and convincing, we affirm.
*411 FACTS
In 1998, Joseph and his wife, Dorothy Lovett Cook (“Dorothy”), executed reciprocal wills leaving all their property to the other and then to their three children in equal portions. Dorothy died in 2005. On July 17, 2012, Joseph, a few days away from turning 90, executed a new will in which he bequeathed all his property .to Dianne, and in the alternative, to Mary Margaret Thurman (“Thurman”), his housekeeper.. ,
The execution of the new will followed months of increasing discord between Dianne and her brothers and of Dianne’s increasing involvement in Joseph’s daily life. At the center of the Cook family discord was Rodidaco, Inc. (“Rodidaco”), a family corporation formed in the 1970s by Joseph, a certified public accountant, and Dorothy, with their three children as the sole and equal shareholders. Upon incorporating Rodidaco, Joseph kept the stock certificates, which were endorsed in blank.
[2Rodidaco owns a large tract of land on U.S. Highway 80 on which is located Robert’s law office, the Cook Law Firm, and Farm Park, Inc. (“Farm Park”), a trailer park and Rodidaco subsidiary developed by Joseph. Since Dorothy’s death, Joseph has lived in a trailer- at Farm Park. Dianne, who also lives at Farm Park next to Joseph, collects rental income from some of the trailers at Farm Park. David operates a restaurant and a granite yard on property owned by Rodidaco. None of the three siblings pay rent for their use of the Rodidaco property. In addition to the income generated by Farm Park, Rodidaco received income from mineral royalties, a pipeline servitude, and leases of radio and/or cell towers located on the property. Both Dianne and David testified that Joseph, although not a shareholder, lived out of Rodidaco, using its funds as needed for his expenses.
Dianne had moved back to Louisiana from California in 1995, From 1996 until 2008,-she worked as the office manager for Robert’s law firm. . Dianne left Robert’s employ when he did not .increase her $135,000 salary, which she admitted was more than some of the attorneys at the firm were making. Dianne testified that Robert had promised that she would make more as they grew the business together, and she did not believe he was keeping that promise;- Robert beliévéd Dianne’s demands equated to establishing a prohibited partnership between a--lawyer -and nonlawyer.' A short time after she left his firm, Robert gave her $200,000. Referring to the payment as-a severance, Robert testified that he was worried about Dianne not being able to.pay her bills. Dianne said he paid it because of his promise to take care of her. Both agreed that, for tax purposes, they | ^considered the payment a buyout of Dianne’s interest in a related advertising business. Robert testified that his relationship with Dianne “went south” after she left his employ.
Dianne then worked for David for a few months. According to David, she left his employ after she tried to fire his wife’s brother, who managed his Crawfish Palace restaurant. Dianne denied this.
In November. 2009, Dianne had a car accident. Shortly after, she sold her house and moved to Farm Park next to her father and began taking care, of him. The record indicates that she was, by this time, Joseph’s, daily companion and that she had taken charge of the bookkeeping and records associated with Rodidaco.
In late 2009, during litigation involving David’s granite business, Dianne testified that she was the sole owner of Rodidaco. This prompted David and Robert to ask Joseph for their, Rodidaco stock certificates. After first calling Dianne, Joseph gave them the certificates. Explaining her *412 testimony in the granite litigation, Dianne stated that Joseph had, over the years, allowed her and her brothers to claim losses to Rodidaco on their individual tax returns, with any refunds placed back into corporation. When David and Robért no longer wanted to participate in that arrangement, she took all the losses and filed tax returns showing herself as 100% owner of Rodidaco.'
Around October 2011, Robert and David asked to see Rodidaco’s financial records. According to Dianne, the request followed an argument with Robert during a family dinner outing. • Joseph objected when Robert | ¿informed him that he had given someone permission to hunt on Rodidaco land. Dianne testified that when she asked Robert to honor Joseph’s wishes, Robert “exploded,” called her a “dominatrix,” and said that he and David did not know what was going on with Rodidaco and Farm Park. She told Robert to be at Joseph’s trailer the next day with David to see the records. Dianne claims that she allowed her brothers to. see all that she had; the brothers allege that the records she provided were incomplete.
After the above episode concerning the corporate records, Dianne retained an attorney, Ken Mascagni (“Mascagni”) of Cook Yancy, King and Galloway (“CYKG”), to represent her in dealing with Robert and David'. Dianne testified that she felt like she’d be “bullied” otherwise. Mascagni wrote to Robert and David on December 10, 2011, informing them that, in light of their questioning the Rodidaco records and suggesting that Dianne had “shorted” them or the corporation, Dianne now “wants to terminate any mutual interest in the corporation and in any property.” The brothers' retained their own attorney. Both sides' demanded records from the other.
Dianne made a proposal for dividing the property between the three ■ siblings and allowing Joseph to retain income from the cell towers and royalties and to have a usufruct over his trailer. Robert testified that the three siblings met, without their attorneys, to discuss the agreement. However, their negotiations were unsuccessful.
In March 2012, Dianne closed on a house in Gulf Shores, Alabama, and had an elevator installed to accommodate Joseph. By May, Dianne and |KJoseph were spending four to five days at a time about every couple of weeks in Gulf Shores.
At the beginning of June 2012, Robert found a letter placed on his desk about a proposal to buy one of the towers on Rodi-daco property. Joseph had written across the top of the letter, “I want my money up front.” David went to Joseph to discuss the sale. But Dianne, who was present with Joseph, intervened and made it clear that the decision to sell had been made. This event precipitated the brothers scheduling the shareholder meeting on June 19, 2012, during which they exercised their majority shareholders’ rights and removed Dianne as secretary of Rodidaco and their 89-year-old father as its president. Robert explained that Joseph was in declining health and that he had abdicated all his functions regarding Rodidaco to Dianne, who also- had Joseph’s power of attorney. He also explained that , they had not discussed with Joseph his removal as president of Rodidaco ahead of the shareholders’ meeting because the removal would not affect Joseph?s livelihood, and they saw no reason to “rile him up.”
Dianne, who had attended the shareholders’ meeting by telephone and recorded it, immediately went to Joseph with the recording and told him “you wouldn’t believe this if I told you so here I recorded it and you need to listen to this.” She testi *413 fied that, after playing the recording, he asked her to play it again and that she played it for him three times. She agreed with Joseph when he concluded that Robert and David had stolen from him. She testified that Joseph said he wanted his property back and asked her what he could do. She advised getting an attorney and suggested that he could | fi“surely” get back the money he had put intó the corporation. Dianne contacted Mascagni for a referral and went with Joseph to CYKG’s offices to meet with another CYKG attorney.
On June 22, 2012, CYKG sent a. demand letter to Rodidaco claiming that it owed Joseph $408,492.13, plus interest, as reflected on the books of the corporation “for loans made over a number of years to that corporation.” Then, on July 3, 2012, a suit styled “Petition on Money Loaned” was filed on behalf of Joseph against Rodidaco while Joseph and Dianne were again in Gulf Shores. Dia-nne testified that they returned .to Louisiana on July 15, 2012, and that she again accompanied Joseph to CYKG on July 17, 2012, to sign the verification for the suit against Rodidaco, to file a petition to probate Dorothy’s will leaving all her property to Joseph, and to execute a new will which had been prepared by a third CYKG attorney, Stephen Yancey (“Yancey”). This new will purported to leave all Joseph’s property, including the claim against Rodidaco, to Dianne or, alternatively, to Thurman. Dianne was present in the room when Joseph signed the new will and the verification for the suit against Rodidaco. Dianne admitted that she talked with Joseph about the lawsuit against Rodidaco and his new will, but she denied having “extensive” discussions. Regarding Joseph’s decision to change his will, Dianne explained that because of what Robert and David had done to him, Joseph believed she would not “see a dime out of the ■ corporation” and wanted to leave whatever he had left to her.
Robert and David maintained that nothing was stolen from their father because he was not a shareholder and that he became enraged against 17th'em by Dianne repeatedly playing the recording of the meeting. Robert testified that he and his daughter, Michelle, tried to visit Joseph a couple of weeks after the shareholders’ meeting. Joseph met them at his doorstep and ordered them off his property. Robert had never seen him that mad. He sent his father a note for his birthday to reestablish communication, but nothing came of it. Regarding their prior relationship, Robert claimed that they were very close and that he saw his father every day until Dianne moved next, door to him. Their relationship then became strained, and Robert visited twice a week or less. Robert stated that it was “very unlikely” that he could have visited with his father without Dianne being there.
Unlike Robert’s experience after the shareholders’ meeting and the filing of the suit, David testified that he was allowed at Joseph’s house with no problems. David recalled meeting with him to get his Social Security number to set up a new account with automatic drafts for his electric bill. Joseph gave him the information without any animosities. David also testified that he and his children visited Joseph in December 2012. They were having a good visit, and Joseph was reminiscing about old war stories. However, his demeanor changed when Dianne arrived. ' Joseph started saying that he wanted his money back, so David and his family kissed him goodbye and left. This was the last time David saw him conscious. Both David and Robert testified that Joseph had good relationships with his grandchildren and that there would have been no reason to disinherit them.
*414 IsRegarding Joseph’s condition during the last years of his life, Robert and David claimed that he stayed in bed much of the time due to arthritis and did. crossword puzzles. He had hearing problems but did not always wear his hearing aids. Robert testified that Joseph was forgetful at times and talked mostly about old war stories and things in the past., David testified similarly. As proof of Joseph’s alleged confusion, they related an incident where he claimed he saw some soap or detergent floating and another incident where he ordered a 25-pound box of poison.
Medical records in evidence show that, as would be expected of a man in his late 80s, Joseph suffered from a number of ailments during the last five years of his life. His ailments included such things as osteoarthritis, hypertension, high cholesterol, coronary artery disease, shortness of breath, urinary incontinence, dehydration, and low potassium. He was treated with medication for anxiety and depression stemming from the death of his wife. In May 2010, his internist, Dr. Rajan Khanna (“Dr. Khanna”), suspected he had suffered mini-strokes or “TIA’s” after Dianne reported that Joseph had awakened with slurred speech, marked generalized weakness, and some confusion. In February 2011, Dianne reported to Dr. Khanna that Joseph was having problems with recent memory loss. He had forgotten food in the oven and how to get to a store. Dr. Khanna believed Joseph was developing Alzheimer’s dementia, a late life condition involving short term memory ■ problems. He suggested a medication, but Joseph was not willing to comply. Dr. Khanna’s records and testimony indicate that Joseph was a stubborn patient who did not always comply with | ¡medical recommendations and that Dianne was always present with Joseph at his appointments and part of the discussions.
While in. Gulf Shores with Dianne for Thanksgiving 2012, Joseph began complaining of chest pain. He was eventually diagnosed with an enlarged thyroid that was pushing on his esophagus and impairing his ability to swallow. Neither Robert nor David were informed of Joseph’s deteriorating health. Faced with either starving to death from being unable to eat, getting nutrients from a feeding tube or catheter, or undergoing a risky surgery, Joseph opted for surgery. The. surgeon, Dr. Glen Lee Watkins (“Dr. Watkins”), felt that Joseph understood his situation and made his own decision. However, Dr. Watkins noted that Joseph was in a debilitated state and that Dianne signed the consent forms.
The surgery took place on January 17, 2013. Dianne claimed that she asked Joseph to call his sons but that he refused. She chose to respect his wishes until the day after surgery when she was told that Joseph’s heart was giving out and that he would not make it. She then called Robert,' who was in Fort Meyérs, Florida. Robert contacted David, who went to the hospital and put a phone beside Joseph so that Robert could say goodbye.
Joseph passed away on January 18, 2013. Dianne filed a petition to probate his will on January 23, 2012 and was confirmed as executrix on January 26, 2013. She substituted herself as party plaintiff in the suit against Rodidaco on February 8, 2013.
On August 30, 2013, Robert and David filed a petition seeking to annul the probated will on the grounds of undue influence by Dianne over Imtheir father, who they alleged suffered from diminished mental and physical capacities. They alleged that Dianne’s actions “created a divisive atmosphere” in an effort to serve her “own vindictive and finaneial/litigious interests” and that she substituted their fa *415 ther’s true testamentary wishes with her own by surreptitiously convincing him.to execute a new will drafted by her attorneys. ...
-A two-day trial' took place on January 10, 2014, and April 30, 2014. In addition to the testimony mentioned above, the pah-ties presented > dueling experts on the issues of undue influence and Joseph’s mental capabilities at the time’ of the execution of the will.-1 Dianne also presented testimony from Yancey, the attorney who prepared the will, and several friends and acquaintances.
Yancey had no doubt in his mind that Joseph knew what he was doing in executing the new will. However, he admitted that Dianne had brought Joseph to his qfflee and that she was “there irequently” with Joseph. The friends who testified generally claimed that Joseph was doing well when they last saw him. Mark Sims, whose wife was close friends with Dianne and who met Joseph in 2004, testified that they invested in properties with Dianne and vacationed in Gulf Shores with her and Joseph. He claimed that Joseph talked to him about his anger and disappointment in his sons during the “months” leading up to the changing of his will. Stephanie Sims testified that she never initiated any conversation with Joseph about his relationship with his sons, but she did recall him saying that they had stolen his business. She was not sure’whether Dianne was [^present for that conversation. She also testified that., she was with Dianne at the hospital before Joseph died and that Dianne asked him to call his sons, but he refused. Mike Weber testified that he and his wife went out to dinner with Joseph and Dianne during the middle of July 2012 and that Joseph was “very on top.” They all . denied seeing anything to suggest that Dianne was making decisions for her father. Thurman, Joseph’s housekeeper and alternate* legatee, testified .that she saw him about four hours, each week.and that there was “nothing the matter” with his mind. She testified that it broke his heart when Robert and David took Rodidaco from him, and she believed that Joseph would have gone along with their plans if only - Robert had asked him to make changes.
After considering the testimony and evidence, the trial court entered a judgment on September 2, 2014, annulling the-will on the grounds of Dianne’s undue influence. In a written opinion, the trial court found that Joseph had capacity to execute the testament, but that the level of influence Dianne had over Joseph was such that it destroyed his free agency and caused her volition to be substituted for his. The trial court explained:
The testimony presented shows that Dianne and Decedent spent significant time alone together, where Dianne is the only witness as to the contents of those conversations. There is no doubt that Dianne cared for her father, however her influence in this matter appears to go beyond “mere advice, or persuasion, or kindness and assistance.” Decedent had recently lost his wife and was suffering from declining health and was dependent on Dianne for his basic needs, including the administration of his financial/business affairs. Although Dianne contends she did not influence Decedent in his decision to change his testament, looking at the facts and circumstantial evidence presented it is of [sic] the opinion of the Court that Dianne would not stay neutral in this situation.
|)2In its written reasons, the trial court noted as important .the facts that the volatile relationship .between Dianne and her brothers “reached a breaking point” when they removed her as secretary of Rodida- *416 co, that the 'sons had á great relationship with their father until the last six months of his life, and that Dianne spent a significant amount of time alone with Joseph. Evidence of Dianne acting to influence Joseph to change his will included Dianne’s recording of the shareholders’ meeting, her playing it multiple times for Joseph, and her agreeing with Joseph that his sons were stealing his money. The trial court found that Dianne reinforced Joseph’s “false beliefs.” - Dianne’s actions in probating her mother’s testament without informing her brothers and her involvement in the filing of the suit against Rodidaco two weeks before she brought Joseph to CYKG to rewrite his testament to make her the sole beneficiary also influenced the trial court’s decision. Finally, the trial court found that Dianne gave some inconsistent testimony regarding important conversations she had with Joseph.
Dianne filed a motion for a new trial, asserting that the trial court failed to give serious enough consideration to her evidence,- including the witnesses who testified that Joseph was furious with his sons. Denying the motion, the trial court stated that it did consider all the evidence, believed that Joseph was furious at his sons, but found that Dianne “was pretty much the source of that anger and that fury[.]” Thereafter, Dianne filed this devolutive appeal.
J^DISCUSSION

Standard of Review

On appeal, Dianne urges this court to examine the record by a standard of review other than manifest error, which’ she asserts does not allow the reviewing court to assess whether the clear and convincing burden of proof was satisfied. She asserts that, although the clear and convincing standard requires a higher burden of proof than -the preponderance of the evidence standard applicable in most civil eases, both types of cases are reviewed under the manifest error standard, which merely requires the reviewing court to determine whether there is no, reasonable factual basis for the trial court’s findings or whether the findings are- clearly wrong. Dianne proposes the adoption of a standard by which the reviewing court would determine whether the existence of disputed fact was “highly probable” or “much more probable than its nonexistence” based on the evidence. She asserts that this standard “would enable this Court to uphold the strong public policy against postmortem amendment o£ testaments[.]”
The burden of proof for claims of under influence is set forth in La. C.C. art. 1483:
A person who challenges a donation because of fraud, düress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between’ the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, dr undue influence by a preponderance of the evidence.
The clear and convincing standard applies in this matter where Dianne, the alleged wrongdoer, is the testator’s daughter.
| uThe clear and convincing standard is an intermediate burden of proof that requires more than a “preponderance of the evidence” but less than proof “beyond a reasonable doubt.” Rather, the evidence must show the existence of the disputed fact to be highly probable, meaning much more probable than its nonexistence. Succession of Lyons, 452 So.2d 1161, 1165 (La.1984). The clear, and convincing stan *417 dard applies in cases “where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds.” Id., citing McCormick on Evidence, Section 340(b), p. 798 (2nd ed. 1972). Cases involving testamentary capacity, termination of parental rights, attorney disciplinary matters, filiation proceedings instituted after the death of the alleged father, and workers’ compensation proceedings involving proof of permanent total disability are examples of the types of matters requiring clear and convincing proof.[1] Each of these involve strong public policy considerations that necessitate, a heightened burden of proof.
In cases requiring proof by clear and convincing evidence, our courts review the factual findings for manifest error. For example, in Hines v. Williams, 567 So.2d 1139 (La.App.1990), writ denied, 571 So.2d 653 (La.1990), a filiation action, the supreme court applied the manifest error standard to the trial court’s findings and then determined whether the . facts Improved paternity by clear and convincing evidence. In attorney disciplinary matters, the manifest error standard applies to the factual findings of the Hearing Committee in reviewing the record to determine whether the alleged misconduct was proven by clear and convincing evidence. In re Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714. The factual findings of the workers’ compensation judge are reviewed for manifest error in determining whether a claimant proved permanent total disability by clear and convincing evidence. Morgan v. Glazers Wholesale Drug Co., 46,692 (La.App.2d Cir.11/2/11), 79 So.3d 417. While the grounds for termination of parental rights must be proven by clear and convincing evidence, the factual findings in such cases are reviewed for manifest error. State ex rel. D.L.R., 2008-1541 (La.12/12/08), 998 So.2d 681. In reinstating a judgment of termination that had been reversed by the court of appeal, the supreme court found that the appellate court had substituted its judgment for-that of the district court without first finding manifest error. Id. In In re Succession of Doucet, 42,963 (La.App.2d Cir.2/6/08), 975 So.2d 738, a case- concerning whether or not the decedent revoked his will, this court reviewed the findings of fact for manifest error in determining that the evidence did not provide clear and convincing proof that someone other than the testator destroyed his will.
Our jurisprudence has been consistent in reviewing findings of fact under the manifest error standard and then, determining whether, absent manifest error, the facts satisfy the clear and convincing burden of proof. This standard ensures that the reviewing court properly assesses the |1fievidence to determine that it meets the intermediate burden of proof, while deferring to the trial court’s better capacity to evaluate witnesses and preserving the allocation of trial and appellate functions between the respective courts. Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no merit to. Dianne’s argument for application of a heightened standard of review heretofore unrecognized by the courts of our state.

*418
Finding of Undue .Influence

Relating to the merits of the case, Dianne argues that the trial court erred in finding that her brothers proved by clear and convincing evidence that she exercised such a degree of influence over her father that his free agency or-volition was destroyed and hers substituted for his. Specifically, she argues that the trial court’s factual conclusions are incorrect and “defy the uncontradicted testimony and evidence in the record.” She asserts that the trial court “completely ■ ignored the uncontra-dieted and unimpeached' testimony of a number of disinterested witnesses” and either ignored or improperly weighed the actions of her brothers in removing Joseph as president of Rodidaco and Joseph’s resultant anger. Lastly, Dianne argues that the trial court reversed the burden of proof by essentially requiring that she “prove that she remained neutral and that she purposefully encouraged reconciliation between her father and her brothers” in order to disprove the allegation of under influence.
La. C.C. art. 1479 provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
|17This court has recognized that undue influence is a subjective standard that is difficult to both define and prove. In re Succession of Cooper, 36,490 (La.App.2d Cir.10/23/02), 830 So.2d 1087. Because “objective aspects of undue influence are generally veiled in secrecy, ... the. proof of undue influence is either largely or entirely circumstantial.” La. C.C. art. 1479, Revision Comment (b). Undue influence includes physical coercion or duress, but the comments state that “more.subtle influences, such as creating resentment toward a natural object of a testator’s bounty by false statements, may constitute” undue influence. Id. The comments caution that “[m]ere advise, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else’s volition for his own.” Id. See also In re Succession of Lounsberry, 2001-1664, pt 4 (La.App. 3d Cir.5/8/02), 824 So.2d 409, 412.
We find no merit to Dianne’s argument that the trial court improperly reversed the burden of proof by requiring her to prove that she remained neutral and encouraged reconciliation between her father and brothers. Regarding Dianne’s assertion that she did not influence Joseph to change his testament, the- trial court opined that she “would not stay neutral in this situation.” The trial court did not require Dianne to prove her neutrality. It simply found that, rather than remaining neutral in the situation between her brothers and father, Dianne acted to influence Joseph to change his testament. This finding is not manifestly erroneous and is supported by clear and convincing evidence in the record.
| ^Contrary to Dianne’s argument, we do not find that the trial court ignored the testimony of any witnesses. The trial court’s opinion and reasons given when it denied Dianne’s motion for a new trial show that it considered all the evidence. The trial court found, as indicated by the testimony of some of the disinterested witnesses, that Joseph was furious with his sons after they removed him from Rodida-co, but it also found that his anger was fueled by Dianne. These findings are not manifestly erroneous. Moreover, we find the testimony of the friends and acquaintances offered by Dianne to be of limited *419 relevance on the ultimate issue of undue influence. As stated in the Revision Comments to La. C.C. art. 1479, the objective evidence of undue influence is often veiled in secrecy. The record shows that Dianne, whose relationship with her brothers had “gone south,” spent much time alone with Joseph, and this time alone afforded her the opportunity to influence him against Robert and David.
The record shows .that the disinterested witnesses either spent little time with Joseph or spent time with him in the company of Dianne. Cary Camp testified that he saw Joseph about four times a year and had last had a 30-minute casual conversation with him in August 2012. Thurman testified that she saw Joseph four hours a week when she did his housekeeping on Thursdays. Weber and his wife had dined with Joseph and Dianne on the evening of July 17,-2012, after Joseph had executed the new will. Mark -and Stephanie Sims were both friends of Dianne before they befriended Joseph and began spending time with the two of them in Gulf Shores. All generally h ¡Indicated that there was nothing wrong with Joseph’s mental faculties; however, testamentary capacity was not at issue. We note that Mark Sims, whose testimony was most favorable to Dianne’s side, testified that Joseph was very upset and angry with his sons and talked, about changing his will for “months.” His testimony indicated that this would have been even before the shareholder meeting on June 19, 2012, but nothing in the record supports Mr. Sims’ claim that Joseph planned to change his will before his removal as president of Rodidaco.
The testimony of Dr. Khanna, Joseph’s longtime physician, was that Dianne regularly attended visits with him and related Joseph’s history and symptoms. Dr. Khanna was not asked his opinion on undue influence and stated that he had' no knowledge of their relationship outside his office. Dr. Watkins likewise indicated that Dianne was present when .he. saw Joseph and that she provided his medical history. Dr. Watkins believed that Joseph- understood his medical options at the end of his life and made his .own decision. However, the decision to proceed with a risky surgery when faced with nothing but dire options is not indicative of whether Dianne exercised undue influence over Joseph regarding the changing, of his will months before his death. The testimony of both physicians highlights Dianne’s intimate involvement in Joseph’s healthcare and daily life.
Both sides presented expert testimony. Dr. Harminder Mallik, a forensic psychiatrist offered as an expert on behalf of David and Robert, concluded from his review of depositions and medical records, telephone interviews with Robert, David, and Dr. Khanna, and 'listening to the | gotestimony of the parties that Joseph was subjected to undue influence by Dianne. Dr. Mallik focused on seven factors which he believed indicated undue influence. In short, these included: (1) the’ unnatural provision of the new will leaving everything to Dianne, or the housekeeper, to the exclusion of even Joseph’s grandchildren; (2) the new will being inconsistent with Joseph’s intent as expressed in his original will; (3) Dianne’s increasing involvement in Joseph’s -care and life; (4) Joseph’s- declining health, including reports of memory problems-noted-in Dr. Khanna’s records; (5) -Dianne’s involvement in procuring the new will; (6) the fact -that Dianne was named the sole beneficiary under the will, reaping undue profit; and (7) the confidential relationship between Dianne and her father , evidenced by his daily dependence on her and her having his power of attorney and access to his bank -account.
*420 After interviewing disinterested witnesses and reviewing depositions, medical records, Dr. Mallik’s report, and the parties’ testimony, Dr. Richard Williams, an expert in general psychiatry, concluded on behalf of Dianne that there was no undue influence. In support of his opinion, Dr. Williams discussed the absence of evidence that Joseph had dementia, that Dianne isolated him from others, or that he was dependent Upon her in a “pathological way.” Notably, Dr. ’Williams likened the dependency indicative of undue influence to Stockholm Syndrome. We believe this goes beyond the type of influence contemplated by La. C.C. art. 1479. -
At the heart of this matter is the testimony of the parties, which establishes the facts and circumstances that clearly and convincingly prove |2¶ undue influence. The record shows that Joseph loved his children, established Rodidaco for their benefit, and maintained good relationships with both his sons until the shareholder meeting of June 19, 2012. Dianne’s relationships with Robert and David had soured before then due to employment disputes and management of Rodidaco. After leaving both Robert’s and David’s, employ and moving next door to Joseph, Dianne became increasingly involved in Rodidaco and her father’s daily life. As Dianne became more involved in her father’s life, her brothers became less involved.
Dianne testified that she always encouraged them to see more of their father, but they indicated that Dianne was always present. Michelle, Robert’s daughter, testified about a dispute that arose during Christmas 2011 at her house when' David confronted Dianne about signing something. According to Michelle, Dianne grabbed Joseph, who was not involved in the dispute, and left. Michelle explained that she’d had to call Dianne to have her grandfather come to her house for Christmas because “they didn’t go anywhere apart. It was always them two.” Additionally, Dianne’s purchase of the house in Gulf Shores allowed her to spend more time alone with Joseph away from the rest of the family and with her friends.
The record clearly shows Joseph’s increasing isolation from his family and dependency on Dianne in the months prior to his execution of the new will and during the time when Dianne and her brothers were seeking to terminate their mutual interests in Rodidaco. After her brothers demanded to see the corporate records, Dianne retained an attorney to 122negotiate terminating their mutual interest in the corporation.’ The record does not indicate whether this was done with or without Joseph’s knowledge. Ultimately, negotiations between the siblings failed. When Robert and David tried to question the decision to sell one of the towers on the Rodidaco property, they were shut out by Dianne and realized that their 89-year-old father had abdicated all his Rodidaco functions to Dianne. They then proceeded with the shareholder meeting to remove Dianne as secretary and Joseph as president.
Considering the increasingly poor relationship between Dianne and her brothers and her increasingly close relationship to Joseph as his primary companion and caregiver, the trial court was not manifestly erroneous in finding that Dianne’s actions after the shareholder meeting were taken for the purpose of creating resentment by Joseph toward his sons and inflaming his anger at his removal as president of Rodi-daco for her own benefit. Telling him “you wouldn’t believe this if I told you,” Dianne immediately went to Joseph with the recording of the shareholder’s meeting and played it for him multiple times. She agreed with his sentiment that his sons had stolen something from him, even *421 though he was not a shareholder in the corporation. By these actions, Dianne- cast her brothers’ actions in' the most negative light and reinforced Joseph’s feelings of anger and betrayal, all to her benefit.
Evidence of Dianne’s undue influence over Joseph also includes her procurement of legal counsel for him from the same firm that represented her in trying to negotiate a division of Rodidaeo property with her brothers. | ¡«Interestingly, the evidence concerning the siblings’ unsuccessful negotiation of a property division does not appear to include any mention of a $400,000-plus debt owed by Rodidaeo to Joseph. Dianne accompanied Joseph to meet with the attorneys who prepared the suit against Rodidaeo, the petition to probate Dorothy’s testament with a detailed descriptive list that included the alleged debt owed by Rodidaeo, .and Joseph’s new will. After returning from another visit to Gulf shores, she accompanied Joseph on July 17, 2012, when he signed the verification for the suit and executed his new will leaving everything to her.
All these facts and circumstances lead to the highly probable, or clear and convincing, conclusion that Dianne exercised undue influence over Joseph regarding his execution of the will naming her as the sole beneficiary and Thurman.as the alternate beneficiary. From our close and thorough review of this matter, we detect no manifest error in the trial court’s findings of fact, and we find that Robert and David have proved by clear and convincing evidence that Joseph’s will was the product of Dianne’s influence that so impaired his volition and substituted her own volition for his.
CONCLUSION
For the reasons explained, we affirm the trial court’s judgment' annulling the testament of Joseph Robert Cook. Costs of appeal are assessed against Dianne Elizabeth Cook.
.AFFIRMED.
CARAWAY, J., dissents with written reasons.

. See Lyons, supra, requiring clear and convincing'evidence to overcome the presumption of testamentary capacity; La. Ch. C. art. 1035(A), requiring proof of the grounds for termination of parental rights by clear and convincing evidence; La. S.Ct. R. 19 § 18(C) and In re King, 601 So.2d 657 (La.1992), requiring clear and convincing proof of attorney misconduct; La. C.C. art. 197, requiring clear and convincing evidence of paternity in actions instituted after the death of the alleged father; and La. R.S. 23:1221(2) regarding proof of permanent total disability by a workers’ compensation claimant.