STONE, J.
| Approximately two years before his death, Andrew John Davisson (“Andrew”) executed an olographic will leaving the entirety of his estate to Sharon P. Cox (“Sharon”) and disinheriting his only son and surviving heir, Jordan Davisson (“Jordan”). Sharon now appeals the trial court’s judgment invalidating Andrew’s will for undue influence and mental incapacity, and declaring null and void two cash sale deeds. For the reasons stated herein, we affirm the judgment of the trial court, but for different reasons.
FACTUAL AND PROCEDURAL BACKGROUND
According to testimony adduced at trial, the last two years of Andrew’s life were plagued by mental instability and bizarre behavior, triggered by the death of his mother and caretaker, Benny Davisson (“Benny”), on February 28, 2012. Andrew had lived with Benny since his criminal troubles in 2010, and Andrew was, at the very least, emotionally dependent on Benny.[1] In her olographic will, Benny requested her attorney, Michael D. Cox (“Michael”), look after Andrew when she died.[2] Michael assisted the “distraught” Andrew with the probate of Benny’s will, as well as the probate of Andrew’s maternal grandparents’ wills. As a result of all three probated wills, Andrew inherited two generations of family assets.[3]
IgPrior to Benny’s death, Michael assisted both Benny and Andrew in numerous civil and criminal matters. Michael represented Andrew in his 2002 divorce from Jordan’s mother, Lori Broussard (“Lori”), and in a drawn-out custody battle with Lori over Jordan. As a result of the custody dispute, Michael filed a defamation lawsuit on Andrew’s behalf against the court-appointed custody evaluator. On appeal, this court ultimately characterized the lawsuit as “frivolous and hurtful.”[4] Moreover, as referenced above, Michael represented Andrew against criminal charges which ultimately led to Andrew pleading guilty to possession of drug paraphernalia on March 5, 2012. All other charges were dismissed.
Several days before executing his will, Andrew approached Michael about assisting him with drafting a will leaving all of his possessions to Michael. According to Michael, he immediately refuted the idea because it was illegal. Despite telling Andrew that he could not assist him in making a will, Michael provided Andrew with a Louisiana Civil Code and allegedly told Andrew that he could leave his possessions to anyone else.
On March 7, 2012, Michael and his wife, Sharon, (collectively referred to as “the Coxes”) invited Andrew to their home for dinner. The Coxes and their daughters, Rachel Cox and Tracy Coco (“Rachel” and “Tracy”) were the only people present at *602 •the home. Rachel testified that Andrew made it known he wanted to draft a will as soon as he walked in the house. After eating dinner, Sharon provided Andrew with a pen and paper and Andrew drafted an olographic will leaving all of his possessions to Sharon and disinheriting his only-son and forced heir, Jordan.[5] Sharon, Ralong with her daughters, witnessed Andrew write his will, but asserts she had no idea of its contents. Michael was at the house but was purportedly in and out the room when Andrew wrote the will. Nonetheless, after Andrew wrote the will, Michael notarized the will with his stamp and signed it, “Michael D. Cox, M.D., J.D. 3/7/2012.” According to Sharon, Andrew left their home with the will.
At the time of Benny’s death, Sharon knew Andrew as Michael’s client but did not know him well. According to Sharon, Andrew was a “basket case” when Benny died and Andrew began leaning on her for emotional support. Incidentally, the Coxes’ relationship with Andrew became less professional and increasingly personal as they began assisting Andrew in his everyday life. Sharon testified Andrew only had $215.00 to his name when Benny died. Andrew’s income included a social security disability income of $698.00 a month (“SSDI check”) and periodic deposits from his grandfather’s asbestos settlement. Since Andrew was still living in Benny’s house, the Coxes advised Andrew to sell his house to make extra money and eliminate some bills.
On May 14, 2012, in a document drafted and notarized by Michael, Sharon became power of attorney over Andrew’s finances. According to Sharon, Andrew was too “lazy” to handle his own affairs, and asked her to |4be his agent for the sale of his house (“Andrew’s house”). Sharon assisted Andrew in preparing his house for sale, and subsequently, represented Andrew at the sale of the house. Andrew’s house sold for $145,000.00, and he collected $64,482.03 in equity. Andrew remained living at Benny’s house, while also maintaining ownership of his grandparents’ house. (“Andrew’s grandparents’ house”).
Sharon’s power of attorney did not cease after the sale of Andrew’s house but extended to Andrew’s everyday activities and expenses. The Coxes testified Sharon performed numerous tasks for Andrew, which included picking up his medicine, bringing him food, attending doctors’ visits, and paying his bills. Sharon contends the tasks and business she performed for Andrew required her to write numerous checks out of his account, including checks made to cash, herself, and Michael, totaling over $50,000.00.
In early October 2013, Andrew checked himself into Willis-Knighton Medical Center in Bossier City. On October 11, 2013, he was transferred to the behavioral unit at Willis-Knighton South for the treatment of depression, alcoholism, and prescription drug addiction. It was on this day Andrew purportedly signed two documents selling his naked ownership in Benny’s house and his grandparents’ house to Sharon for $100.00 each, “plus other good and valuable consideration and remunera *603 tion.” Sharon testified it was Andrew’s idea to sell his naked ownership in the houses to her. The cash sale deeds were signed by Andrew and witnessed by Haley Poole (“Haley”), 1¡¡a Willis-Knighton nurse, and Lance Grider (“Lance”), the Coxes’ son-in-law. The cash sale deeds were notarized by Michael.[6]
On October 18, 2013, a week after purportedly signing the cash sale deeds, Andrew reached out to attorney Chris Broussard (“Chris”), Lori’s husband and Jordan’s stepfather. Andrew told Chris he was terminally ill and wanted to make changes to his will and power of attorney. Chris found it strange that Andrew solicited his help; since Andrew’s divorce from Lori and their custody dispute over Jordan, Andrew treated Chris in a contentious manner. Chris testified Andrew believed the Coxes were taking advantage of him and misrepresenting his financial situation. Andrew expressed to Chris that he had no idea where all of his money went, and no idea why the Coxes were telling him that he had none. Andrew informed Chris that Michael drafted his will, and he wanted to revoke it and leave everything to Jordan.
A couple of days later, Chris visited Andrew at the behavioral unit to assist Andrew in changing his will. However, Andrew was physically infirmed and unable to keep his hand steady enough to write a revocation. On October 22, 2013, both Lori and Chris (“the Broussards”) visited Andrew at the behavioral unit. They attempted to give Andrew a typewritten notarial testament and power of attorney revocation for his review, but Andrew acted as though it wasn’t a good time. Soon after the Broussards’ arrival, the Coxes showed up and Andrew became frantic and demanded everyone leave. The Broussards waited thirty minutes to see Andrew, but the Coxes never left. Thereafter, Sharon placed the Broussards |fion the no-visitors list, preventing the Broussards from further assisting Andrew while he was in the behavioral unit.
On October 30, 2013, Andrew was discharged from the behavioral unit, and Sharon’s power of attorney was expanded to include all of Andrew’s healthcare decisions moving forward. According to the Coxes, Andrew did not want anyone from his family to have knowledge of his condition. Although the record is not clear about Andrew’s condition the months leading up to his death, it is apparent that Andrew was out of the hospital and living on his own. During this time, he was under the care of Amelia Carter (“Carter’), a home health nurse, who visited Andrew three times a week for depression and suicidal thoughts.
After a doctor’s visit in late January 2014, Andrew was immediately admitted to Willis Knighton Hospital in Bossier City. Debra Stapa (“Debra”), Andrew’s friend, informed the Broussards that Andrew was gravely ill and again wanted Chris’ help with the Coxes. However, by the time the Broussards and Jordan made it to the hospital, Andrew was in a coma. Chris made multiple requests that Jordan be allowed to speak with physicians concerning Andrew’s condition, but the Coxes ultimately denied them. On February 13, 2014, the Broussards and Debra contacted Lieutenant Shannon Mack of the Bossier Parish Sheriffs Office (“Lieutenant Mack”) to report a belief that the Coxes were scamming Andrew out of money. Three days later, on February 16, 2014, Andrew died due to complications resulting from cirrhosis of the liver.
On February 28, 2014, Michael probated Andrew’s olographic will. Lori, on behalf of *604 Jordan, responded by filing a petition to annul the probated testament, asserting that it was null and void due to Andrew’s lack 17of mental capacity and undue influence by the Coxes. Lori also claimed the detailed descriptive list was inaccurate, because of the improper transfers of Benny’s house and Andrew’s grandparents’ house to Sharon in the months leading up to Andrew’s death. Lori claimed the consideration given for the transfers was inadequate and Andrew lacked the mental capacity to make them. In April 2015, Jordan reached majority and was substituted for Lori in the lawsuit.
Sharon originally chose Michael to represent her in the lawsuit, but Michael was disqualified by the trial court for being a material witness. On the first day of the bench trial, Sharon was represented by the late James Caldwell, however, Caldwell resigned from the case for health reasons. Sharon chose to proceed pro se. After taking the matter under advisement, the trial court concluded Andrew’s will was clearly the product of undue influence by the Coxes, and Andrew lacked the sufficient physical and mental capacity to execute the will under Louisiana law. The trial court declared the cash sales deeds in which Andrew sold his naked ownership in Benny’s house and his grandparents’ house to Sharop null and void because they were not executed in the authentic act. Sharon now appeals.
DISCUSSION

Admissibility of Evidence

First, Sharon argues the trial court erred in allowing Jordan to submit audio recordings of conversations Chris had with Andrew. Chris testified he recorded his conversations with Andrew and Jordan sought to introduce the audio recordings into evidence. Initially, Sharon objected to the introduction of the audio recordings. However, after her objection, the trial court informed the parties that the audio recordings would be played in their |sentirety, in camera, and Chris would testify to their nature with Sharon having the opportunity to cross-examine him. When asked by the trial court if she still objected to the admission of the audio recordings, Sharon replied, “No, sir,” and the audio recordings were admitted into evidence.
Failure to invoke a rule of evidence constitutes a waiver of the corresponding objection, and the aggrieved party subsequently on appeal may not complain of the inadmissibility of the evidence. Pratt v. Culpepper, 49,627 (La.App. 2 Cir. 2/27/15), 162 So.3d 616, 621. Since Sharon failed to object to the admission of the audio recordings, she is prohibited from urging their inadmissibility on appeal. Pratt, supra.
Next, Sharon argues the trial court erred in refusing to admit Andrew’s medical records. The trial court’s scheduling order required discovery to be completed no later than sixty days before trial, unless extended by the court for good cause. On the second day of trial, after informing the court she would proceed pro se, Sharon attempted to introduce Andrew’s medical records. Sharon testified that she was previously unable to get authorization for copies of Andrew’s medical records. However, the trial court found them inadmissible because they were not produced before the commencement of trial.
A trial court. has wide discretion concerning the admissibility and relevancy of evidence, and a trial court’s ruling will not be disturbed on appeal absent a clear abuse of discretion. Hooker v. Wal-Mart Stores, Inc., 38,244 (La.App. 2 Cir. 3/3/04), 867 So.2d 869, 878. Sharon failed to subpoena the medical records or inform the court she was having difficulty obtaining *605 the medical records until after the commencement of trial. As a |9result, we find no abuse of discretion in the trial court’s refusal to admit Andrew’s medical records.
Lastly, Sharon argues the trial court erred in excluding the testimony of Lance because he was not included on Sharon’s witness list. The trial court’s scheduling order stated the parties’ witness and exhibit lists had to be completed no later than thirty days before trial unless extended by the court for good cause. The trial court omitted Lance’s testimony, concluding that it would unfairly prejudice Jordan. After a review of the record, we find no abuse of discretion in the trial court’s conclusion.

Lack of Capacity

An appellate court may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Masters v. Masters, 33,-438 (La.App. 2 Cir. 4/5/00), 756 So.2d 1196, 1199, writ denied, 803 So.2d 975 (La. 2001) (citing Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Nonetheless, when a finding of fact is interdicted because of some legal error implicit in the fact-finding process or when a mistake of law forecloses any finding of fact, an appellate court is forced to review the record de novo to render judgment. Mack v. Evans, 35,364 (La.App. 2 Cir. 12/5/01), 804 So.2d 730, 733, writ denied, 2002-0422 (La. 4/19/02), 813 So.2d 1088.
The trial court determined Jordan established by a preponderance of the evidence that Andrew lacked the requisite mental capacity to execute a valid will under Louisiana law. However, a person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked the requisite capacity to execute his will. La. C.C. art. 1482. |inSince the trial court applied the wrong standard of proof, we are forced to review the issue de novo.
All persons have the capacity to make and receive donations inter vivos and mortis causa, except as expressly provided by law. La. C.C. art. 1470. Capacity to donate mortis causa must exist at the time the testator executes the testament. La. C.C. art. 1471. There is a presumption in favor of testamentary capacity. In re Succession of Furlow, 44,473 (La.App. 2 Cir. 8/12/09), 17 So.3d 475, 477. Testamentary capacity means the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. La. C.C. art. 1477; Furlow, supra.
Debra was the only witness Jordan presented who testified to Andrew’s capacity around the time he executed the will. Debra became acquainted with Andrew as a frequent customer of her liquor stores. Debra testified that after Benny’s death, Andrew was prone to emotional breakdowns, confused, frequently incoherent, and incapable of making his own decisions. Debra further testified Andrew’s appearance deteriorated to the point he was unkempt and looked “like death.” Based on her interactions with Andrew, Debra believed Andrew was mentally incapable of executing a will.
Additionally, Jordan points to Andrew’s behavior while hospitalized at the behavioral unit in October 2013. According to testimony, Andrew was uncooperative, irrational, confused, and displaying bizarre behavior. The Coxes alleged Andrew attempted suicide, wrote on the bathroom wall with his feces, and was suffering from hallucinations. Moreover, Andrew requested Sharon take him to Oregon because they had assisted suicide.
In Sharon claims Andrew understood the nature and consequences of executing his *606 will. Despite Andrew being noticeably upset after Benny’s death, Sharon contends Andrew was living on his own and taking care of himself without assistance. In support of her position, Sharon asserts Andrew was able to read the Louisiana Civil Code, write his own olographic will, and contact Chris over a year later to seek advice about changing the will.
The burden is on Jordan to prove by clear and convincing evidence that Andrew lacked capacity at the time he executed the testament. La. C.C. art. 1482 (emphasis added). To prove a matter by “clear and convincing” evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. In re Succession of Cooper, 36,490 (La.App. 2 Cir. 10/28/02), 830 So.2d 1087, 1090.
Debra’s testimony as to Andrew’s outrageous behavior is the strongest evidence presented by Jordan to prove Andrew lacked capacity at the time he executed the will. The rest of the evidence presented by Jordan pertained to Andrew’s capacity more than a year after he executed the will. Our concern with Debra’s testimony is that she had minimal contact with Andrew, and failed to clarify whether she observed Andrew’s outrageous behavior before or after the will’s execution.
Revision Comment (f) of Article 1477 states, “outrageous behavior by an individual may or may not be indicative of a lack of ability to understand. Some outrageous behavior may be nothing more than a personality quirk, while other outrageous behavior may manifest serious mental disturbance.” With this in mind, Debra’s testimony alone is insufficient to show | ^Andrew’s outrageous behavior was a symptom of a serious mental disturbance and not just a personality quirk. Since the record is devoid of medical records, expert testimony, or testimony in general corroborating Debra’s observations, we cannot say it was highly probable Andrew did not understand the nature and consequences of executing his will. Cooper, supra. Accordingly, we find the trial court erred in finding Andrew lacked the requisite mental capacity to execute the will.

Undue Influence

Next, Sharon argues the trial court erred in finding Andrew’s will was clearly the product of undue influence.
Louisiana Civil Code article 1479 provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
This court has repeatedly recognized that undue influence is a subjective standard that is difficult to both define and prove. In re Succession of Cook, 50,111 (La.App. 2 Cir. 12/16/15), 189 So.3d 409, 418, reh’g granted (03/30/16), writ denied, 2016-0795 (La. 6/17/16), 192 So.3d 768. Because “objective aspects of undue influence are generally veiled in secrecy.. ..the proof of undue influence is either largely or entirely circumstantial.” La. C.C. art. 1479, Revision Comment (b).
Undue influence includes physical coercion or duress, but the comments state “more subtle influences, such as creating resentment toward a natural object of a testator’s bounty by false statements, may constitute” undue influence. See, La. C.C. art. 1479, Revision Comment (b); Cook, supra. To annul a testamentary disposition on the basis of undue influence, |1Hthe influence must be operative at the time the testament is executed. In re Succession of Gilbert, 37,047 (La.App. 2 Cir. *607 6/5/03), 850 So.2d 733, 736, writ denied, 2003-1887 (La. 11/7/03), 857 So.2d 493.
Louisiana Civil Code article 1483 sets forth the applicable burden of proof for claims of undue influence:
A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
An attorney/client relationship is considered a relationship of confidence under La. C.C. art. 1483. Since Michael was Andrew’s attorney at the time Andrew executed his will, Jordan is only required to prove undue influence by a preponderance of the evidence. The proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. Hanks v. Entergy Corp., 2006-477 (La. 12/18/06), 944 So.2d 564, 578. Undue influence is a question of fact, and the trial court’s determination will not be disturbed unless clearly wrong. Cooper, supra.
In determining Andrew’s will was clearly the product of undue influence, the trial court relied largely on circumstantial evidence. The trial court stressed that Andrew executed his will only days after the death of Benny, his mother, and caretaker while fighting an uphill battle to reestablish a visitation schedule and relationship with his son, Jordan. The trial court noted Debra’s testimony that Benny was Andrew’s only family, and that after Benny’s death, he was mentally and emotionally confused. | uThe trial court also considered that Andrew’s will was executed just two days after he pled guilty to possession of drug paraphernalia.
The trial court found the circumstances surrounding the will’s execution problematic, and determined if Michael “did not draft the will himself, he certainly provided [Andrew] with the knowledge, means, and intent to draft the olographic will.” The trial court also found it inconceivable that Andrew, without any coercion or influence by the Coxes, would execute a will leaving all of his possessions to a woman he barely knew. The trial court stated Andrew was so desperate to get away from the influence of the Coxes that he reached out to Chris, a man he had been fighting for custody rights of Jordan for years, for help.
After reviewing the evidence, we also find the timing and circumstances surrounding the will’s execution problematic. The will was executed during a time Andrew was undoubtedly struggling with Benny’s death. Prior to the will’s execution, Andrew had a conversation with Michael about executing a will, and Michael provided Andrew with a Louisiana Civil Code. Michael allegedly told Andrew he couldn’t leave his things to him but could leave them to anyone else. Thereafter, Andrew is invited to the Coxes’ home for dinner. Sharon provides Andrew with a pen and paper, and Andrew writes an olo-graphic will leaving all of his possessions to Sharon, a woman he barely knew. The only witnesses to the will’s execution were the Coxes and their two daughters.
Andrew, at some point, believed the Coxes were taking advantage of him. In a recorded conversation, Andrew tells Chris that Michael drafted the will and that he wanted to leave all of the possessions to *608 Jordan in a trust. Sharon was aware Andrew wanted to leave something to Jordan but | -^continually told Andrew he did not have the money to do so. Andrew told Chris he felt captive by the Coxes and was suffering from Stockholm’s Syndrome. When Chris advised Andrew that he should just change his will, Andrew became volatile and said Michael would “go crazy.” Chris’ impression of Andrew was a man “scared to death” of the Coxes.
Probably the most compelling evidence of undue influence is the Coxes’ financial control over Andrew after Benny’s death. Andrew received $64,482.03 from the sale of his house and a $698.00 SSDI check each month. Andrew- received checks from his grandfathex-’s asbestos settlement and money from Benny’s IRAs. During her power of attorney, Sharon testified she deposited approximately $104,000.00 into Andrew’s account, but Sharon was constantly telling Andrew he had no money.
Lieutenant Mack testified Sharon wrote checks out to herself, to cash, and to Michael totaling over $50,000.00. Sharon claims the checks were used to pay Andrew’s bills and other expenses. However, Lieutenant Mack discovered the majority of Andrew’s bills were set up as an automatic draft, including Andrew’s mortgage. Sharon also claims the money was used to reimburse her and Michael for money Andrew owed them. According to the Coxes, Andrew owed Michael over $10,000.00 in legal fees and owed Sharon $45,000.00 for taking care of him.
The Coxes provide no evidence that Andrew owed them any money. To the contrary, the record suggests the Coxes owed Andrew money. For example, Sharon received a $15,000.00 check from Andrew as a loan, but provides no evidence the money was ever paid back.[7] Sharon also received |1ña ring from Andrew that appraised at $1,500.00. In order to offset legal fees Andrew owed Michael, Andrew gave Michael his Toyota 4Runner. Moreover, Andrew sold his naked ownership in two houses to Sharon for $100.00 each, even though the houses had a total equity value of $180,000.00. More troubling is that despite the sales, Andrew’s mortgage and utility bills on the houses were still being drafted out of his account.
The Coxes maintain they did not take advantage of Andrew and were only trying to help him. However, our review of the record reveals an entirely different stoi-y. After Benny’s death, it is clear Andrew was looking for friendship, security, and help, and the Coxes used it to their advantage by meticulously divining him of all of his assets and money. The record is replete with facts illustrating the Coxes undue influence over Andrew. As a result, we find no manifest error in the trial court invalidating Andrew’s will as the product of undue influence.

Validity of Cash Sale Deeds

Sharon argues the validity of the cash sale deeds were improperly before the trial court because it was never pleaded with a demand for relief. In his petition, Jordan argued Benny’s house and Andrew’s grandparents’ house should have been included in the detailed descriptive list. While the petition did not specifically demand the cash sale deeds be declared null and void, the trial court was allowed to grant Jordan any relief he was entitled, pursuant to La. C.C.P. art. 862.[8] We find *609 Jordan’s petition placed Sharon on|17notice that the validity of the cash sale deeds would be an issue at trial. Thus, the cash sale deeds were properly before the trial court.
The trial court declared the sale of Andrew’s naked ownership in two houses to Sharon null and void because the cash sale deeds were not in an authentic act. The trial court found the cash sale deeds were improperly witnessed and improperly notarized as Michael was never a commissioned notary of the State of Louisiana.[9] Further, the trial court stated Sharon failed to sign the cash sale deeds as required by Louisiana law.
The Louisiana Civil Code’s writing requirement for the sale or transfer of immovable property states that the parties must execute “an authentic act” or “act under private signature.” La. C.C. arts. 1839 and 2440. An authentic act is a “writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed.” La. C.C. art. 1833. In contrast, an act under private signature only requires the signatures of the parties and does not require the act be signed by the party in whose favor it is made. Acceptance may be established by acts clearly indicating it. La. C.C. art. 1837; See Mitchell v. Clark, 448 So.2d 681, 686 (La. 1984) and Cecil Blount Farms, L.L.C. v. MAP00-NET, 47,246 (La.App. 2 Cir. 7/25/12), 104 So.3d 1, 5, writ denied, 2012-2263 (La. 1/11/13), 107 So.3d 614.
In the instant case, the cash sale deeds met the requirements of an act under private signature; they contained Andrew’s signature and Sharon manifested her acceptance by paying the consideration and asserting her | ^ownership. The trial court committed legal error when it declared the cash sale deeds null and void for improper form. As a result, a de novo review of the record is required to determine whether the sales are valid under Louisiana law. Mack, supra.
A sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2349. Because a sale is a conventional obligation, a valid contract must exist. A contract is an agreement between two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. A contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art 1927.
The court must find there was a meeting of the minds of the parties to constitute the requirement of consent. Worley v. Chandler, 44,047 (La.App. 2 Cir. 3/4/09), 7 So.3d 38, 41-42. Consent may be vitiated by error, fraud, or duress. La. C.C. art. 1948. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953. Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, *610 or special skill. However, this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other’s assertions or representations. La. C.C. art. 1954.
Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art. 1957. Parol 119evidence is permissible when error, fraud, or duress is alleged. Revision Comment (b) of La. C.C. art 1848. Even without evidence of specific statements, fraud may be proved by “highly suspicious facts and circumstances surrounding a transaction.” Skannal v. Bamburg, 44,820 (La.App. 2 Cir. 1/27/10), 33 So.3d 227, 237, writ denied, 2010-0707 (La. 5/28/10), 36 So.3d 254.
We find the circumstances surrounding the execution of the cash sale deeds highly suspicious. Skannal supra. First, the testimony of Haley and Lieutenant Mack discredits the Coxes’ narrative as to how the cash sale deeds were executed. On the day the cash sale deeds were allegedly executed, Andrew was at Willis-Knighton Bossier, and then transferred to Willis-Knighton South. Yet, Haley, one of the alleged witnesses to the cash sale deeds, testified she was at Willis-Knighton North, which was confirmed by her Willis-Knighton employment records. Haley testified she recalled signing something but not the cash sale deeds. She further claimed to not know Michael, Andrew, or Lance, the other parties who purportedly participated in the execution of the cash sale deeds.
Lieutenant Mack testified of her encounters with Lance, the other witness to the cash sale deeds. When Lieutenant Mack first approached Lance about witnessing the cash sale deeds, he responded by telling Lieutenant Mack that he was only doing Michael a favor, and he could not remember signing the cash sale deeds nor could he recall witnessing Andrew’s signature. The very next day, after stating Michael had “jogged” his memory, Lance gave Lieutenant Mack a written statement claiming that he and all the named parties witnessed Andrew sign the cash sale deeds.
| ¡^Secondly, only one week after purportedly signing the cash sale deeds, Andrew called Chris about the Coxes taking advantage of him and misrepresenting his financial situation. During the conversation, Andrew admitted the Coxes were misrepresenting the value of his possessions in an attempt to hide their true intentions. Andrew stated he believed the Coxes were “low-balling” the value of his grandparents’ house, and talked as if he stilled owned the house. Andrew disclosed that Michael did not want him talking to his cousins, Barbara and Laura, who, prior to a partition by licitation filed by Michael, owned an interest in Andrew’s grandparents’ house.
Lastly, the cash sale deeds were executed on the same day Andrew was transferred to the behavioral unit for treatment of depression, alcoholism, and drug addiction. While in the behavioral unit, the Coxes testified Andrew was uncooperative, irrational, confused, and displaying bizarre behavior. The Coxes further testified that Andrew attempted suicide, wrote on the bathroom wall with his feces, and was suffering from hallucinations. Despite his condition, Sharon asserts Andrew was knowingly able to sale his naked ownership in two houses, with a total equity of $180,000.00, for only $200.00. Sharon claims Andrew sold his naked ownership in the two houses to remunerate a debt to her for $45,000.00. However, as stated earlier, Sharon provides no evidence that Andrew owed her any money.
*611 This court finds it hard to believe Andrew knowingly and voluntarily sold his naked ownership in two houses to Sharon for only $200.00. Around the time Andrew allegedly executed the cash sale deeds, he was showing signs of incapacity. Excluding the Coxes, there were two alleged witnesses | aito the execution of the cash sale deeds, Haley and Lance. Haley testified she did not witness Andrew sign the cash sale deeds, and Lance was unable to remember witnessing Andrew sign them until he talked with Michael. Moreover, a week after allegedly selling his naked ownership in two houses to Sharon, Andrew expressed a belief that the Coxes were not being honest about his financial situation, and Andrew was under the impression he still owned the houses. As a result, it is more probable than not the Coxes misrepresented certain facts to Andrew in order to gain ownership in Benny’s house and Andrews’ grandparents’ house. Thus, for different reasons, we find the trial court did not err in declaring the cash sale deeds null and void.
CONCLUSION
Based on the aforementioned, we affirm the judgment of the trial court for different reasons. All costs of this appeal are assessed against the defendant-appellant, Sharon Cox.
AFFIRMED FOR DIFFERENT REASONS.
APPLICATION FOR REHEARING
Before WILLIAMS, MOORE, PITMAN, GARRETT and STONE, JJ.
Rehearing denied.

. Beginning in 2010, Andrew faced drug charges and charges stemming from his alleged improper care of Jordan.

. Interestingly, Benny bequeathed all her possessions to Michael in the event Andrew proceeded her in death.

. In her will, Andrew’s grandmother left one-half of her assets to Andrew’s grandfather and the other half to her two daughters, one being Benny, equally. In his will, Andrew’s grandfather left all of his assets to Benny. In her will, Benny left all of her assets to Andrew, Benny owned a home in Bossier Parish, and Andrew’s grandparents owned a home together in Caddo Parish. On September 3, 2013, Michael, on behalf of Andrew, filed a partition by licitation of Andrew’s grandparents’ house against two of Andrew’s cousins. Michael paid Andrew’s cousins $3,125.00 each for their interest in the house.

. Davisson v. O’Brien, 47,384 (La.App. 2 Cir. 8/8/12), 104 So.3d 467.

. Specifically, Andrew handwrote, signed, and dated the following:
Last Will & Testament
March 7, 2012
I, Andrew John Davisson, do hearby [sic] leave all that I die possessed of [sic] to Sharon P. Cox, 205 Tealwood Dr., Bossier City, LA.
I expressly disinherit my son, Jordon DeForest Davisson, because he struck me with a raised hand on numerous occasions and falsely accused me of a felony and other allegations.
(Signature of) Andrew John Davisson March 7, 2012

. Sharon filed the cash sale deeds in the conveyance records on October 24, 2013.

. Notably, in a recorded conversation with Chris, Sharon alluded to never borrowing $15,000.00 from Andrew.

. La. C.C.P. art. 862 provides:
Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded *609 such relief in his pleadings and the latter contain no prayer for general and equitable relief.

. In a letter dated April 9, 2015 and made a part of the trial record, the Louisiana Secretary of State confirmed Michael was never a commissioned notary public in and for the State of Louisiana.