Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,564-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF JAMES MILLER, SR.

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Jackson, Louisiana
Trial Court No. P-7742

Honorable William R. "Rick" Warren, Judge

* * * * *

| | |
|---|---|
| LAW OFFICES OF CHRIS L. BOWMAN<br>By: Chris L. Bowman | Counsel for Appellant,<br>Paul C. Miller |
| CULPEPPER & CARROLL, PLLC<br>By: Teresa C. Carroll | Counsel for Appellee,<br>Richard Warren<br>McManus, Jr. |

* * * * *

Before STONE, THOMPSON, and HUNTER, JJ.

**HUNTER, J.**

Plaintiff, Paul C. Miller, appeals a trial court judgment denying his petition to nullify the last will and testament of his late father, James Miller, Sr. For the following reasons, we affirm.

**FACTS**

On December 4, 2018, decedent, James Miller, Sr. ("decedent"), executed a notarial testament, which provided, in pertinent part:

> I, JAMES MILLER, SR., *** being of sound mind and memory, and although not contemplating my early demise, yet realizing that death is sure and certain, hereby declare this act and instrument to be my Last Will and Testament, and I expressly revoke any and all prior Wills or Codicils made by me at any time.
>
> *** I have been married two times. I first married KATHY PRESTLEY, and of the marriage, only two children were born, namely, PAUL C. MILLER and JAMES MILLER, JR. My son, JAMES MILLER, JR., died in [a] vehicle accident on March 21, 1986, when he was 25 years old. My son, PAUL C. MILLER, is over the age of 24 years, is competent and is capable of managing his own personal affairs. My marriage to KATHY PRESTLEY MILLER was dissolved by Divorce about the year of 1980. My second and last marriage was to MARGARET FONTANA on December 7, 1981, in Jackson Parish, Louisiana. No children were born of or adopted during the marriage. The marriage was dissolved by her death on November 2, 2011. I have not remarried since her death and am single at this time. I have never adopted anyone.
>
> I will and bequeath unto my step grandson, RICHARD WARREN McMANUS, JR., full ownership of all the property I may own at the time of my death, whether movable, immovable or personal property, of every kind, nature an[d] description, wherever located and however acquired.
>
> I name and appoint RICHARD WARREN McMANUS, JR., as the Independent Executor of my estate, without the obligation of furnishing bond or other security and direct him to pay as they become due, all of my just debts and obligations, including my funeral and death expenses, if any, and the costs an[d] expenses of the administration of my estate.
>
>                \s\ JAMES MILLER, SR.
>
> In the presence of the undersigned Notary Public and witnesses, the Testator has declared and signified that he has read this

instrument, and declared that it is his Last Will and
Testament[.]

\s\ JAMES MILLER, SR.

*** 

Richard McManus is the grandson of Margaret Fontenot Miller, decedent's

wife, who predeceased him.[1]  Decedent signed the will in the presence of

decedent's attorney, Sam O. Henry, III, and two witnesses, Evanda R.

Hattaway and Shannon Weaver.

The will, which was prepared by decedent's attorney and his staff,

contained the following errors:

1. The will named the mother of decedent's children as,
   "Kathy Prestley," when her maiden name was "Presley,"
   and Evelyn Furr was mother of decedent's children.
2. The will omitted decedent's marriages to Evelyn Furr, Helen
   Etheridge, and Catie Merle Pruitt and the fact that those
   marriages ended in divorce.
3. The will stated "Margaret Fontana" was decedent's second
   wife, when she, in fact, was his fifth wife.  The will also
   stated her name was "Margaret Fontana," when her name
   was "Margaret "Fontenot."
4. The will stated decedent was married "two times," when he
   was married five times.

Decedent died on November 6, 2020.  Before the will was presented

for probate, on December 4, 2020, plaintiff, Paul C. Miller, filed a petition to

nullify the testament and sought to be appointed administrator of the estate.

Plaintiff alleged decedent "lacked the requisite capacity to fully understand

the nature of the transaction and the disposition of his property under the

terms of the purported will."  He also asserted decedent's memory had been

"on the decline for several years," he "required assistance in signing his

name due to the severe shaking of his right hand," and he had been taking

prescribed narcotics for pain.  Plaintiff also sought an ex parte order to

---

[1] In a prior will, decedent had bequeathed all his possessions to Margaret Miller.

2

restrain McManus from entering or removing any property from decedent's estate "pending further orders of the Court." On December 7, 2020, the trial court granted the restraining order prohibiting McManus from entering the property and/or alienating assets; the court also granted plaintiff's request to be named executor of decedent's estate.

Subsequently, on April 23, 2021, McManus answered the petition to nullify the will, alleging, in part, decedent had the requisite mental capacity to execute a will. McManus also asserted plaintiff "had been estranged from the decedent for years prior to his death, and accordingly, was not in any position to personally know the truthfulness of any of [the allegations]" pertaining to decedent's mental capacity. McManus also filed a dilatory exception of prematurity, arguing the petition to nullify the testament was premature because the will had not been presented to the court for probate. Further, assuming the position of plaintiff-in-reconvention, McManus presented the will for probate.

On April 27, 2021, the trial court set aside the previous orders naming plaintiff as executor of the estate and enjoining McManus from entering the property. The court signed an order for the probate of the will, appointed McManus as independent executor of the will, and issued a preliminary and permanent injunction enjoining plaintiff from entering decedent's immovable property and/or removing, disposing of, or alienating any assets of the estate.

In response, plaintiff filed an objection to the probate of the will and to the appointment of McManus as independent executor. Plaintiff asserted he is the sole remaining heir of decedent, and decedent's memory "has been on the decline for several years." Plaintiff also alleged the deterioration of

3

decedent's memory was evidenced by the errors in the testament. Further, plaintiff alleged decedent was "under the influence of" McManus, who was "providing certain aspects of his care" when the testament was executed.

A hearing was held on June 28, 2021. Plaintiff's wife, Susan Miller, testified decedent was injured in April 2018 and was "having a lot of physical pain that year."[2] She stated she and plaintiff traveled from Arizona to Louisiana "to spend a few weeks and take care of him." Miller further testified decedent was complaining of "joint pain, all over pain, and specifically, back pain," and he was "confused and disoriented" and unable to drive. According to Miller, following a visit to the emergency room after his fall, decedent was prescribed "some sort of medication," and he had difficulty reading the labels on the medications, and "he didn't know why he was taking them and what he should be taking." She stated she made a list of all of decedent's medications, including the times he should take each one, and she wrote large numbers on the bottles to enable him to distinguish one medication from the other. Miller opined decedent's inability to read the labels was caused by an unspecified "mental status" and poor eyesight. She further testified she returned to Louisiana in August 2018 and noticed decedent "was looking frail," and he "just seemed . . . like he was displaced . . . like his awareness wasn't quite there." Miller stated she last saw decedent when she visited in August 2018, more than two years before his death.

Plaintiff testified as to the inaccuracies in decedent's will regarding the number of marriages, the incorrect information regarding the mother of

---

[2] Witnesses testified decedent sustained injuries to his neck, back, and hip when he fell out of the bed and became "trapped between his bedframe and his night stand."

decedent's children, and the misspellings of the maiden names of two of decedent's former wives. Plaintiff testified he became concerned about decedent's mental status after decedent's death when he read the will and saw the inaccuracies. Plaintiff stated he did not believe the errors would have existed had decedent's mental status been intact. He explained his father was meticulous about "paperwork," and he would have noticed the errors and corrected them. According to plaintiff, he requested decedent's medical records after he saw the errors in the will. While reviewing the medical records, he discovered, during a visit to a clinic in November 2018, decedent stated he was "unsure" of his medical history, and a notation in the records described decedent as a "poor historian." Further, plaintiff testified in December 2018, when the will was executed, decedent "was having to get people to drive him around . . . was no longer mowing his yard . . . just started shuffling his feet a lot," and he had become noncompliant with his medications. Additionally, plaintiff testified in April 2018, he noticed decedent would become "a little bit confrontational" when he would try to get him (decedent) to do something. He also testified McManus would help decedent around the house with tasks such as mowing the lawn and stacking wood for the fireplace. Plaintiff opined decedent would have known he had been married five times, and he would have known which wife was the mother of his children had he been mentally competent when the will was executed.

During his testimony on cross-examination, plaintiff admitted he and decedent did not always get along. Plaintiff also testified he last visited his father in 2018, during the months of April, June, August, and "in the September/October time frame."

5

Attorney Sam O. Henry, III, testified decedent was his long-term client, and he and his secretary prepared decedent's last will and testament. He stated he, decedent, and decedent's late wife, Margaret, were personal acquaintances, and he had handled Margaret's succession. Henry testified he had recommended an update to decedent's will because his prior will had "left everything to Margaret," who was deceased.

Henry testified it was his general policy to "go through a real detailed ritual about testaments." He stated prior to preparing a will, generally, he and his secretary would interview clients and gather information regarding their family history, primarily to ascertain whether there were any forced heirs. He also stated on the day decedent's will was prepared, decedent came to his office alone, and the information contained in the will was obtained from decedent. Henry further asserted just because decedent did not tell him he had been married five times did not mean he was mentally incompetent. He stated, "A lot of folks don't want to tell you *** all about their background." Henry testified he was not concerned about decedent's mental capacity, despite the inaccuracies in the will. He stated he had known decedent 25-30 years, but he did not know anything about his medical history or his prescription medications. Henry noted decedent was "just getting older," but he "certainly didn't see anything up here that indicated he had any mental deficiencies." He further testified he had known decedent many years, and he did not consider him as someone who could be influenced by anyone else. Henry reiterated decedent came to his office alone, he did not know McManus, and he did not meet him until after decedent's death.

Evanda Hattaway testified she had been employed at Henry's law firm since 1958, and she had worked directly for Henry since 2000. She did not recall meeting decedent until shortly before the will was prepared. Hattaway testified after the will was prepared, a draft of it was mailed to decedent for his review. Thereafter, decedent made an appointment and returned to the law office to sign the will. Hattaway further testified she, Henry, and another employee from the law firm were present when decedent signed the will, and she did not have any concerns about whether decedent understood the document he was signing. Hattaway stated:

> As a notary, and if I'm a notary on a Last Will and Testament, I
> small talk. We talk about current events, just things like that, so
> I can satisfy myself that that the person that's signing the will
> knows exactly what they're doing. It's important.
>                                    ***

Hattaway also testified on the day the will was executed, decedent acknowledged he had read the will, and he stated bequeathing his assets to McManus was "the right thing to do" because "he is the only one that check[s] on me." With regard to the errors in the testament, she stated she "assumed [decedent] had read his will, the draft that we sent." Hattaway was unable to recall where she obtained the information decedent had been married twice, instead of five times, and she stated she acquired the information regarding the mother of decedent's children from "notes in the file." She also stated other than the law firm's files and information she gathered from talking to decedent, she had no independent way of ascertaining how many times decedent had been married and who mothered his children. According to Hattaway, decedent acknowledged he had read the testament, and she assumed the information contained therein was correct. She testified decedent arrived at the law office alone, and she does

7

not know who, if anyone, drove decedent to the appointments. On redirect examination, Hattaway testified she had "no doubt whatsoever" decedent "knew what he was doing" when he executed the testament.

McManus testified decedent was his mother's stepfather, and he described decedent as his "grandfather, step or not." He stated prior to decedent's April 2018 injury, he visited decedent "once a week to every two weeks." After decedent's injury, he visited him at least once a week, "sometimes more," and he called him every day. He confirmed plaintiff's testimony decedent was not always compliant with his pain medication, stating decedent would "take it when he would." He explained decedent was noncompliant with his medication because he "hated pills and going to the doctor," and he "didn't take any kind of medication." McManus stated after decedent was injured, he was in severe pain and was unable to "get around" as well. He testified decedent had been prescribed medications for pain and arthritis, and he would take the medications only as needed because "he didn't like the way they made him feel . . . a little bit woozy." According to McManus, decedent began taking the mediations more regularly as his pain worsened, approximately six months before his death. He testified in 2018, either he or plaintiff would mow decedent's yard and help him gather firewood. McManus also testified in 2019, decedent began to require more assistance, as his pain progressively worsened. He stated he would occasionally drive decedent around town to pay bills; however, he did not assist decedent with business or financial matters. With regard to mental competency, McManus testified decedent did not have any issues with his memory, and he was able to take care of his own "business matters." He stated decedent would sometimes require assistance writing because "his

8

right arm would shake real bad." He also testified decedent "lived by his watch," and was never unable to understand normal day to day activities.

During his testimony, McManus was provided copies of decedent's medical records. During visits to Chatham Rural Health Clinic in November 2018 and February 2019, his medical records described decedent as "alert and aware," and "memory intact, normal effect." The one notation in the medical records which mentioned "dementia" was dated June 29, 2020, and provided, "[Medication] needs to be adjusted but he refuses lab work today and does suffer from dementia."[3] McManus testified by July 2020, decedent experienced more difficulty taking care of his daily needs because of increased pain. However, decedent refused to allow anyone to assist him, and he "didn't want anybody staying with him."[4] A notation from a visit to the clinic in September 2020 described decedent as "alert and aware times three, memory intact, normal [a]ffect."

McManus testified he did not arrange for decedent to see an attorney about updating or preparing a will, he did not drive decedent to his appointments with the attorney, and he did not make any calls to the attorney's office on behalf of decedent. Further, McManus stated he did not threaten to stop assisting decedent if he did not change his will, and he was never granted power of attorney to handle decedent's affairs. He testified in early 2020, decedent informed him he had prepared a will, where the will was located, and the name of the attorney who had prepared it. However, he

---

[3] There was no evidence in the medical records decedent was ever formally diagnosed with dementia.

[4] Decedent's medical records indicate in July 2020, he refused additional medications, refused to consult with a cardiologist for atrial fibrillation, and refused home health care and inpatient hospitalization.

9

stated he did not see the copy of the will, and he did not call the attorney's office until after decedent's death.

During his cross-examination, McManus reiterated he did not drive decedent to the attorney's office on the day the will was prepared. He stated decedent was still driving in 2018, and it was possible he drove himself from Chatham to the attorney's office in West Monroe. McManus also stated he did not know how many times decedent had been married and who was the mother of decedent's children. He testified he knew the will stated his grandmother's maiden name was Fontana, rather than Fontenot, and he brought the error to the attention of the attorney when he read the will after decedent's death. He testified he "just figured it was a clerical error and just a mistake." Further, McManus testified he would occasionally assist decedent in signing checks in 2019 and 2020 because, by that time, "the shaking in his right hand had gotten so bad and he couldn't sign his own name." He also testified decedent had "good days and bad days," and when he was having severe pain, he would be "extremely frustrated, upset, and aggravated." He stated he did not see the decedent on the days he went to the attorney's office, so he had no knowledge of decedent's physical or mental condition on those days.

Plaintiff was called as a rebuttal witness. He testified he began writing checks for decedent as early as April 2018 because decedent's hands would shake and he "just couldn't focus his eyes on the paper." Plaintiff also testified although he did not see his father in December 2018, based on his observations in the months after decedent's fall in April 2018, he did not believe decedent would have had the ability to review and execute a will in December 2018. He opined decedent would have known he had been

married five times and the correct name of the mother his children had he been in his "right mind."

After hearing the witnesses' testimony and reviewing the evidence presented, the trial court overruled plaintiff's objection to the probate of the will "due to his failure to meet his burden of proof." The court ordered the will to be "probated and executed in accordance with law," stating:

> In order to successfully contest the will based on mental capacity or testamentary capacity, you've got to show by clear and convincing evidence that the testator did not understand the nature or the consequences *** of creating the will and also the provisions of the will. I find the testimony of Mr. Henry and Ms. Hattaway to be particularly impressive and important. They performed numerous wills over the years, over the many years of law practice, and I find their testimony concerning his competency to be very important. As far as the medical evidence, the medical evidence does not prove that he was incompetent. There was no evidence of any undue influence. If Mr. McManus [was] going to try to influence his step-grandfather to produce a will that left everything to him, I would have expected him to have been taking him to the attorney. That was not done. There are apparent mistakes in the will concerning the marital history and also concerning the mother of the two children. However, I do not find that these mistakes prove that Mr. Miller was incompetent at the time that he executed the will[.]

Plaintiff appeals.

## DISCUSSION

Plaintiff contends the trial court erred in overruling his objection to the petition to probate the notarial testament. He argues the court erroneously found he failed to meet his burden of proving decedent lacked the mental capacity to execute the testament. According to plaintiff, he proved, by clear and convincing evidence, decedent was incapacitated when he executed the "purported will" on December 4, 2018.

All persons have the capacity to make and receive donations *inter vivos* and *mortis causa*, except as expressly provided by law. La. C.C. art.

11

1470. In an action to annul a notarial testament, the plaintiff always has the burden of proving the invalidity of the testament. La. C.C.P. art. 2932(B). The capacity to make a will is tested at the time the will is made. La. C.C. art. 1471; *Succession of Elliott*, 52,595 (La. App. 2 Cir. 4/10/19), 269 So. 3d 1144, *writ denied sub nom. Succession of Elliot*, 19-00723 (La. 9/6/19), 278 So. 3d 367; *Succession of Young*, 96-1206 (La. App. 3 Cir. 3/5/97), 692 So. 2d 1149.

A party is presumed to have testamentary capacity. *Succession of Elliott*, *supra*; *Succession of Lawler*, 42,940 (La. App. 2 Cir. 3/26/08), 980 So. 2d 214, *writ denied*, 08-1117 (La. 9/19/08), 992 So. 2d 939. Testamentary capacity means the testator must be able to comprehend generally the nature and consequences of the disposition he or she is making. La. C.C. art. 1477; *Succession of Davisson*, 50,830 (La. App. 2 Cir. 12/22/16), 211 So. 3d 597, *writ denied*, 17-0307 (La.4/7/17), 218 So. 3d 111. The issue of capacity is factual in nature; the ultimate finding that the testator either possessed or lacked capacity cannot be disturbed unless clearly wrong or manifestly erroneous. *In re Succession of Furlow*, 44,473 (La. App. 2 Cir. 8/12/09), 17 So. 3d 475; *Cupples v. Pruitt*, 32,786 (La. App. 2 Cir. 3/1/00), 754 So. 2d 328.

A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor executed the testament. La. C.C. art. 1482. To prove a matter by "clear and convincing" evidence means to demonstrate the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. *Succession of Davisson*, *supra*; *In re Succession of Cooper*, 36,490 (La. App. 2 Cir. 10/23/02), 830 So. 2d 1087.

12

A testator's ability to read is an element of testamentary capacity, not authenticity or formality. *Id.* Whether a testator has the ability to read is a question of fact, and absent manifest error, the trial court's finding will not be overturned on appeal. See, *Succession of Elliott*, *supra*; *Succession of Lawler*; *supra*; *Succession of Young*, *supra*.

In the instant case, it is undisputed the testament contained errors with regard to the number of times decedent had been married, the name of the mother of decedent's children, and the correct spelling of the names of at least two of decedent's former wives.

Henry, the attorney who prepared the will, testified he was a long-time acquaintance of decedent, and he had handled the succession of decedent's former wife, Margaret. Henry and his employee testified decedent was able to converse and answer questions appropriately, and there was no indication decedent lacked testamentary capacity. Henry and Hattaway both testified as to what could have contributed to the errors in the testament. Henry explained decedent may not have wanted anyone to know how many times he had been married. Hattaway stated she obtained the information in the will from decedent and from the law office's files. Nevertheless, Henry and Hattaway testified they had no doubt decedent understood the nature and consequences of executing his will. Additionally, the evidence demonstrated at the time the will was executed, decedent was living on his own and was taking care of his personal, financial, and business needs with nominal assistance from others.

Further, the limited medical records indicate decedent would not answer questions about his medical history, and he refused some of the medical treatments offered to him. However, despite decedent's lack of

13

cooperation, notations in the medical records clearly stated defendant was alert and oriented during the visits to the clinic, and there was no indication decedent lacked the capacity to execute a will on December 4, 2018. Furthermore, the evidence established decedent had difficulty reading the print on medication bottles and had difficulty signing checks due to "shaking in his right hand." Nonetheless, the medical documents were silent as to any vision examinations, and there is no showing decedent was incapable of seeing and/or reading the last will and testament he directed Mr. Henry prepare. More specifically, none of the evidence or testimony established decedent was unable to see, read, or understand the will during his visit to his attorney's office on December 4, 2018.

We have reviewed this record in its entirety. Based on this record, we cannot say the trial court was clearly wrong in finding plaintiff failed to satisfy his burden of proving by clear and convincing evidence decedent lacked the mental capacity to execute the December 2018 will. The assigned error lacks merit.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to plaintiff, Paul C. Miller.

**AFFIRMED.**