867 So.2d 869 (2004)
George HOOKER, Jr., Plaintiff-Appellee,
v.
WAL-MART STORES, INC., Defendant-Appellant.
No. 38,244-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2004.
*871 Allen & Gooch by Eric J. Waltner, Lafayette, for Appellant.
Street & Street by C. Daniel Street, Monroe, for Appellee.
Before STEWART, GASKINS & PEATROSS, JJ.
PEATROSS, J.
This appeal arises from a workers' compensation judgment awarding workers' compensation benefits to the plaintiff, George Hooker, Jr. ("Hooker"). The defendant, Wal-Mart Stores, Inc. ("Wal-Mart"), now appeals the judgment. For the reasons stated herein, we affirm.

FACTS
Hooker commenced work for Wal-Mart as a grocery stocker at a store in Monroe in 1999. In September 2002, he was injured *872 on the job; and, after refusing to return to work during the time his doctor had excused him from work, he was fired by Wal-Mart. In October 2002, Hooker filed a disputed claim for workers' compensation benefits against Wal-Mart.
Part of Hooker's job entailed the use of an electric pallet jack to unload groceries from delivery trucks. On September 3, 2002, Hooker was working inside the trailer on one of these trucks when the pallet jack went out of control and caused a number of boxes to fall. This in turn caused the trailer's rear door to come down and strike Hooker on the head. At the hearing, he testified that the blow "knocked [him] silly," but did not cause him to lose consciousness. Hooker reported the accident immediately to the market manager, James Tedeton. He stated that he requested medical treatment, but that he was refused; he testified that "they wanted me to wait until the next day."
The next day, Mr. Tedeton took Hooker to the emergency room at the North Monroe Medical Center. Hospital records from that date reflect that Hooker complained of "neck pain, pain in pace maker area[1]." Hooker also complained of a headache. The hospital records show that the attending physician diagnosed Hooker with "cervical strain, chest wall strain, minor scalp contusion." The doctor gave Hooker some medicine for the pain, instructed him to rest that day and to work only light duty for four days and then to see a specialist if he had not improved.
Hooker worked on light duty for several days and then worked for approximately another week on either light or regular duty. The next week Hooker took a week of already-scheduled vacation before seeing a specialist, Dr. Sidney Bailey, on September 17, 2002. After reviewing Hooker's x-rays and conducting a physical examination, Dr. Bailey diagnosed Hooker with a cervical strain, recommended physical therapy and prescribed DayPro, an anti-inflammatory medication. Hooker made an appointment to see Dr. Bailey again on October 10, 2002. Dr. Bailey also gave Hooker a note stating "George Hooker needs to be off work until 10-7-02." Hooker took the note to Wal-Mart and gave it to the personnel manager, Sandra Johnson.
Hooker attended several physical therapy sessions and stated that the therapy helped him. He testified that Wal-Mart paid him approximately $59 in workers' compensation indemnity benefits representing either a day and a fourth or a day and a half of work. On September 20, 2002, Dr. Bailey's office received a fax from Angie Nichols with Claims Management, Inc. ("CMI") with reference to Hooker's claim for compensation. The fax cover letter stated that Hooker had filed a compensation claim with CMI and asked the doctor to complete an attached temporary alternative duty form and treatment plan and fax it back to CMI.[2] Dr. Bailey stated that these forms were routinely received in his office. The fax cover letter stated that "Your assistance in this matter will allow the associate to safely recover at *873 work, earn a full wage, and continue to receive benefits." According to Dr. Bailey's deposition testimony, he noted on the form that Hooker could do light duty work, but could not work on a ladder, reach over his head or work over his shoulders and that he should alternate sitting and standing. Dr. Bailey was not specifically able to explain or articulate what made him change his recommendation from "no work until October 7," in the doctor's excuse he gave to Hooker, to light duty work as indicated on the form, without reexamining him.
On September 24, 2002, Dr. Bailey's office received a second fax, this time from Eloise Leonard, a nurse at Wal-Mart's third-party compensation administrator, CorVel at CMI. The fax cover letter noted Dr. Bailey's diagnosis of a cervical sprain/ strain and stated that Wal-Mart could provide the employee with a modified position under any restrictions the doctor outlined. The letter asked, "What harm could come to Mr. Hooker working within restrictions for a cervical sprain?" The letter also asked Dr. Bailey to complete a "work form" outlining specifically the restrictions to be placed on Hooker's work. On this form, as on the form received on September 20, 2002, Dr. Bailey indicated that Hooker could not work on a ladder, reach over his head or work over his shoulders and that he should alternate sitting and standing. This form, entitled the "Wal-mart and Sam's Club Return to Work Activity PrescriptionTemporary Duty Available," is in the record. It was signed by Dr. Bailey on October 7, 2002. The form asks Dr. Bailey when Hooker can return to work with restrictions and the answer provided is "now," without giving a specific date.[3] The form also provides that it would not be known until the next appointment when Hooker could return to work without restrictions.
At his deposition, Dr. Bailey expressed some surprise regarding the September 20, 2002 fax in that he completed the attached form so close to CMI's original request. Dr. Bailey said that he was usually not so prompt in completing and returning the forms, that it often took a week or two and that for him to quickly complete a form "some level of urgency was demonstrated to me" and that this "would most likely have to be more than a letter, again, or it wouldn't have been that prompt." He speculated, but did not know, that someone had called his office regarding the form and he did not know if the information on the forms was ever communicated to Hooker.
On September 25, 2002, the same day Dr. Bailey faxed the first forms back to CMI, Wal-Mart notified Hooker that he was to return to work. Hooker returned to the store and spoke to Wal-Mart employee Mary Edmonson who informed Hooker that Dr. Bailey had sent a fax to Wal-Mart releasing him to light-duty and that Wal-Mart had a light-duty job for him to do. He testified that he tried to show his note from Dr. Bailey excusing him until October 7, but that no one from Wal-Mart would look at it. He further stated that he did not look at the fax that was sent to Wal-Mart from Dr. Bailey's office because he had not been back to see Dr. Bailey. Hooker did not return to work at that time.
At some point before October 7, 2002, Hooker was at his cousin's house when his cousin told him that someone from Wal-Mart had called him. Hooker related at the hearing that his cousin informed him *874 that the Wal-Mart representative had called and left instructions for Hooker to call the store. He testified that the caller told his cousin that Hooker's doctor had called Wal-Mart and wanted Hooker to come back to work. Hooker stated that he never authorized anyone at Wal-Mart to communicate with his doctor or discuss his medical treatment with his cousin and never received a copy of any correspondence from Wal-Mart to the doctor. In addition, Hooker reiterated that he had not seen the doctor since September 17, 2002.
Hooker testified that he called the store and spoke to a manager, Derek Blue, who offered him a job as a door greeter at his same rate of pay and within the restrictions set by Dr. Bailey. Hooker initially accepted the job, but later rescinded his acceptance because he was afraid that he would be ordered to do some type of work, like lifting something, that he could not do; Hooker stated that this had happened at Wal-Mart in the past and he had been suspended from work for refusing to follow such an order.[4] He later explained:
Wal-Mart does not believe in light duty. They have you doing any and everything. And earlier I got hurt with the same type of injury back in the summerthe first year I worked there in the summer. And I was on light duty. They made me do things that I wasn't suppose (sic). I refused to do the things that I wasn't suppose (sic) to pick up. They suspended me three and a half weeks without pay, and that's another reason I did not want to go back.
On September 27, 2002, Wal-Mart, through CMI, paid Hooker one payment of $59.68 in indemnity benefits. Instead of reporting to work for the jobs offered to him in September, Hooker waited until October 7, 2002, as specified on his doctor's excuse, to return to Wal-Mart. When he returned, Wal-Mart fired him because he had not reported to work on the days after the job offers were made.
On October 8, 2002, Hooker filed a disputed claim for workers' compensation benefits against Wal-Mart in the Office of Workers' Compensation. Hooker alleged that he had been temporarily totally disabled in an accident at work and that Wal-Mart had refused to pay the full amount of indemnity benefits owed as well as all medical benefits owed. Hooker sought benefits, penalties and attorney fees.
On October 10, 2002, Hooker kept his appointment with Dr. Bailey. Dr. Bailey noted Hooker's continued complaints of pain and recommended an additional round of physical therapy to help alleviate stiffness and inflammation in his spine. Dr. Bailey released Hooker to full duty on that date. Hooker testified that Wal-Mart refused to pay for this additional therapy.
The Workers' Compensation Judge ("WCJ") heard the matter on May 21, 2003. Hooker claimed that Wal-Mart owed him two weeks of compensation at $202.40 per week as well as medical benefits ordered by his doctor. Hooker also asked for penalties and attorney fees for Wal-Mart's refusal to pay these benefits.
During the hearing, Wal-Mart attempted to introduce records purported to be those of its claims manager showing that it had approved six physical therapy sessions for Hooker and that he had, by October 10, 2002, only attended five such sessions. The WCJ did not allow these records into evidence as they were not certified, as required under workers' compensation *875 hearing rules.[5] Wal-Mart refused to pay for any additional physical therapy sessions.
By way of impeachment, Wal-Mart called three employees, Derek Blue, Chaz Brookshire and Daniel Young, who testified as to specific instances where they heard Hooker state that he did not want to come back to work because he was not being treated right by Wal-Mart or that he would stage an accident. Hooker denied that he made any of these or similar statements as claimed by these employees.
Hooker admitted that he had suffered several accidents while working for various employers over the years that he had failed to disclose at his deposition, although Hooker's counsel pointed out that he may have been confused by the questioning at the deposition. Wal-Mart attempted to offer into evidence various documents purporting to be records from, inter alia, Brookshire Grocery Company and County Market, two of Hooker's former employers, documenting his compensation claims at those employers. The judge did not allow these documents into evidence because no one from those companies was present to identify the records as authentic and because no additional evidence was necessary to prove that Hooker had not reported all of his previous claims at his deposition.[6] Wal-Mart did not produce any evidence that Hooker was not injured.
After hearing all of this evidence, the court rendered judgment in favor of Hooker. The WCJ found that Hooker's injuries were consistent with his version of the accident and that he had suffered an injury at work when the trailer door hit him on the head because the medical records from the hospital the next day noted the contusion to his head and cervical and chest wall strains. Further, the WCJ found that Dr. Bailey's release of Hooker to work on September 25, 2002, was based not on any change in Hooker's condition, but "on whatever information was provided to him by the representative of the employer." The WCJ concluded that the employer had contacted Hooker's doctor without following the procedures set forth in La. R.S. 23:1127 and, further, had discussed the claimant's medical history with an unauthorized person, his cousin. The WCJ found that the employee had not proven actual damages as a result of this latter contact, but would have been entitled to them if he had.
The WCJ rendered judgment in favor of Hooker awarding benefits, penalties and attorney fees. In addition, the WCJ found that Hooker should have been off work until October 7, 2002, as first recommended by his doctor, that he was temporarily totally disabled from September 17, 2002, until October 7, 2002, and that Wal-Mart failed to pay workers' compensation benefits as required by law. The WCJ also found that the employer should have paid for additional physical therapy for Hooker. In conjunction with these findings, the court assessed Wal-Mart with a penalty of $2,000 for each of the two violations of the law and awarded Hooker $6,000 in attorney fees, $4,000 for the failure to timely pay indemnity benefits and $404.80, representing two weeks of workers' compensation temporary, total disability indemnity benefits. The WCJ allowed Wal-Mart a credit for all benefits already paid, but ordered Wal-Mart to pay Hooker's outstanding medical bills. Wal-Mart now appeals, raising the following assignments of error (verbatim):
*876 1. The Court erred in finding that the claimant satisfied the objective evidence of injury requirement by relying upon a medical report indicating that the claimant was diagnosed with a cervical and chest wall strain and that the claimant had a contusion on his forehead;
2. The Court erred in its interpretation of 23:1127;
3. The Court erred in awarding indemnity benefits in light of the job offers and the doctor's medical opinion that the claimant was capable of performing same;
4. The Court erred in awarding penalties as to indemnity benefits as those benefits were terminated in accordance with 23:1201.2;
5. The Court erred in awarding penalties as to indemnity benefits as there was not arbitrarily and capriciously behavior;
6. The Court erred in refusing to admit into evidence the pre-certification documents pertaining to the physical therapy; and,
7. The Court erred in awarding penalties and attorney fees as to the physical therapy as that treatment was properly not paid or at the very least there was not arbitrary and capricious behavior in reference to same.

DISCUSSION
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Chaisson v. Cajun Bag and Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375. In applying the manifest error clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. Where there are two permissible views of the evidence, a fact finder's choice between them can never be manifestly erroneous or clearly wrong. Id. "Thus, `if the [fact finder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Id., citing Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, (La.7/1/97), 696 So.2d 551.
La. R.S. 23:1317(A) provides, in part:
[T]he workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence and all compensation payments provided for in this Chapter shall mean and be defined to be for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself....
The hearing officer has the discretion to admit hearsay evidence in workers' compensation proceedings. Chaisson, supra. Such evidence can qualify as "competent evidence," provided that the evidence has some degree of reliability and trustworthiness and is of the type upon which reasonable persons would rely. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard. Id.
The WCJ found that Hooker was entitled to temporary total disability benefits from September 17, 2002, to October 7, 2002. La. R.S. 23:1221(1)(c), provides, in pertinent part:

*877 [C]ompensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
Further, La. R.S. 23:1203(A) provides, in pertinent part:
[T]he employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services.
This duty, however, is limited to the reimbursement determined to be the mean of the usual and customary charges for such care, services, treatment, drugs and supplies, as determined under the reimbursement schedule annually published pursuant to La. R.S. 23:1034.2 or the actual charge made for the service, whichever is less. La. R.S. 23:1203(B).

Indemnity and Medical Benefits
With regard to Hooker's entitlement to temporary total disability indemnity benefits, we observe that he was instructed by his doctor on September 17, 2002, not to return to work until October 7, 2002, approximately three weeks later. This instruction was based upon the doctor's opinion after examining Hooker on September 17. The doctor observed Hooker during the examination and thereafter and saw nothing to indicate that Hooker was fabricating his symptoms. The medical evidence altogether is sufficient to establish a compensable "objective" injury as contemplated by La. R.S. 23:1317(A). Wal-Mart provided no evidence that Hooker was not injured.
Dr. Bailey provided Hooker a note ordering that he not work until the specified date of October 7, 2002. Hooker gave this note to Wal-Mart. On September 25, 2002, however, at Wal-Mart's request, Hooker's doctor faxed CMI a form delineating the work in which Hooker could and could not engage. Dr. Bailey was unable to explain why he changed his recommendation with regard to Hooker's ability to work in the absence of a more recent physical examination of Hooker. As noted by the WCJ, the doctor suggested that his completion of the form was done at the prompting of the Wal-Mart agent. The change in the doctor's recommendation was not based on any observed change in Hooker's condition. We, therefore, believe that the WCJ was not manifestly erroneous in concluding that Hooker proved his entitlement to temporary total disability benefits from September 17, 2002, through October 7, 2002. Likewise, we find no error in the WCJ's conclusion that Wal-Mart should have paid for Hooker to undergo a second round of physical therapy. Dr. Bailey was of the opinion that this therapy would have been beneficial to Hooker's recovery and noted that some types of therapy require the assistance of a therapist. Wal-Mart provided no evidence that the physical therapy would not have been reasonable medical care.

Admission of Evidence
We also find no error in the WCJ's refusal to admit into evidence the claims management and former compensation claims evidence proffered by Wal-Mart. *878 With regard to the claims management evidence, no representative of the claims management company appeared to authenticate or explain these records and we do not believe that these particular records are of a type that are self-explanatory. Also, they were not certified as required under the workers' compensation hearing rules. Moreover, at least one of these records contains double hearsay of the type rejected in Chaisson, supra.
As for the previous claims evidence, the WCJ determined that this voluminous documentary evidence was not relevant or helpful to prove the point for which it was offered. The determination of the relevance of evidence is within the wide discretion of the trial court, and the court's ruling in that regard will not be disturbed on appeal in the absence of a clear abuse of discretion. Crowson v. Crowson, 32,314 (La.App.2d Cir.9/22/99), 742 So.2d 107. Hooker admitted to other prior compensable accidents at trial, and Dr. Bailey explored the effect of such incidents on Hooker in his deposition, which was admitted into evidence. As Hooker admitted to these injuries at trial, we find no abuse of discretion in refusing to admit alleged documentary evidence of the same.

Penalties and Attorney Fees
This is a case where the employee alleges that the employer failed to pay continued installments of indemnity benefits and not a case where wrongful termination of benefits is alleged. Accordingly, La. R.S. 23:1201(F), not La. R.S. 23:1201.2, is the appropriate penalty statute. Gilcrease v. Wal-Mart Stores, Inc., 36,523 (La.App.2d Cir.12/11/02), 843 So.2d 415. Under La. R.S. 23:1201(F), an employee has the burden of proving his entitlement to statutory penalties for the employer's failure to timely pay workers' compensation benefits. Bolton v. Mike Fleming Construction, 36,521 (La.App.2d Cir.12/11/02), 833 So.2d 1177. To reasonably controvert a workers' compensation claim so as to avoid imposition of penalties and attorney fees, the employer and its insurer must provide sufficient factual and medical information to reasonably counter the evidence provided by the claimant. Id. To meet this standard, the employer must have some "valid reason or evidence upon which to base his denial of benefits." Feild v. General Motors Corporation, 36, 339 (La.App.2d Cir.9/18/02), 828 So.2d 150. The court must determine whether the employer "engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." Feild, supra. Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Bolton, supra.
An award of attorney fees is a type of penalty in workers' compensation matters. Ward v. Phoenix Operating Co., 31,656 (La.App.2d Cir.2/24/99), 729 So.2d 109. The penalty for the behavior is the imposition of the attorney fee, rather than the amount of the attorney fee. The amount of the fee must be assessed in accordance with law, i.e., the fee must be reasonable. Id. Thus, the court must assess the degree of skill involved and the amount of time counsel spent representing the claimant to arrive at a reasonable attorney fee. Id. The WCJ's decision to award or deny attorney fees is subject to the manifest error standard of review. Bolton, supra, citing Feild, supra.
We find no manifest error in the decision of the WCJ awarding statutory penalties and attorney fees on both the failure to pay indemnity benefits and the failure *879 to pay medical benefits. Wal-Mart was in possession of an order from Hooker's physician directing that he not work until October 7, 2002. That order was based upon the doctor's contemporaneous examination of Hooker. In ordering Hooker back to work before October 7, 2002, Wal-Mart relied on a form completed by the doctor in the interim issued at their request without the benefit of a second examination of the employee and without any expressed reason for the change in restrictions. We also note that the cover letter accompanying the form completed in September instructed the doctor that timely completion of the return to work form would allow Hooker to "safely recover at work, earn a full wage, and continue to receive benefits." This is obviously an incomplete statement of the law and tends to suggest that Hooker's continued receipt of benefits are somehow tied to the completion of the form.
Given all of these factors, it was unreasonable for Wal-Mart to rely on the amended information from the doctor in ordering Hooker to return to work. Further, we find no justification whatsoever for the employer's refusal to pay for the physical therapy ordered by Dr. Bailey. Wal-Mart is not excused in this case from ensuring that Hooker received all of the reasonable medical care recommended by his physician. We do not find it necessary to address the parties' extensively briefed contentions regarding the employer's alleged violation of La. R.S. 23:1127, because the WCJ did not make any award to Hooker under that statute alone. The WCJ's other findings are sufficient to sustain the awards of penalties and attorney fees. Wal-Mart's assignments of error are without merit.

CONCLUSION
For the foregoing reasons, the judgment of the WCJ against Wal-Mart Stores, Inc., is affirmed. Costs of this appeal are assessed to Wal-Mart Stores, Inc.
AFFIRMED.
NOTES
[1] Hooker's pacemaker is located in his upper left chest.
[2] Oddly, it appears that the fax cover letter is in the record, but the attached pages to the cover letter are not. Apparently, the "Alternative Duty Form" filled out by Dr. Bailey is not in the record. When questioned by Wal-Mart's counsel, Dr. Bailey acknowledged in his deposition that he filled out such a form and faxed it back to CMI on September 25, 2002. Evidently, a job description sheet was also attached and Dr. Bailey indicated on it that Hooker could work as an invoice clerk, greeter or film clerk within his restrictions. The job description sheet is also not in the record.
[3] This form seems to be consistent with Dr. Bailey's original finding that Hooker not return to work until October 7, 2002, since it is signed on that date and indicates that "now" is the time he can return to work with restrictions, rather than listing a specific date.
[4] The counsel for Wal-Mart describes Hooker's feelings about Wal-Mart's communication with his doctor and orders to return to work as a "dirty phony."
[5] Wal-Mart proffered the records into evidence.
[6] Wal-Mart proffered the records into evidence.