Judgment rendered August 27, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,497-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

IN THE MATTER OF TWO (2)                    Defendant-Appellant
CANINES SEIZED FROM
SUSAN GRAHAM, RAYVILLE,
LOUISIANA

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. 50,077

Honorable Stephen Gayle Dean, Judge

* * * * *

JAMES EDWARD PATTON, II          Counsel for
                                 Defendants-Appellants,
                                 Susan Graham and
                                 In the Matter of Two
                                 Canines Seized from
                                 Susan Graham

AMANDA MICHELE WILKINS           Counsel for
Assistant District Attorney      Plaintiff-Appellee,
                                 State of Louisiana

* * * * *

Before PITMAN, ROBINSON, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Susan Graham, appeals a district court judgment which granted the State's motion to seize two of her dogs, declared the dogs dangerous and an immediate threat to public health and safety, and ordered them to be humanely euthanized at defendant's cost. For the following reasons, we affirm.

## FACTS

Defendant, Susan Graham, is the owner of nine or ten dogs. In 2022, one of Graham's dogs bit a meter reader who worked for the local water company.[1] The Richland Parish Sheriff's Office ("RPSO") issued Graham summons for unlawful ownership of a dangerous dog. She pled guilty to the violation and was placed on misdemeanor probation. Under the terms of her probation, Graham was required to post warning signs around her premises and to keep her dogs either on leashes or within appropriate secure enclosures.

On January 22, 2025, Graham and her next-door neighbor, Julie Smith, were outside their respective residences. Two of Graham's dogs, named Yellow and Red, were in the yard with Graham; the dogs were neither on a leash nor enclosed in a secure enclosure. Graham asked Julie for a cigarette, and Julie went inside her residence to retrieve the cigarette. Meanwhile, Molly, Julie's seven-year-old daughter, arrived home by school bus and went inside her home. Moments later, Molly exited her residence carrying the cigarette her mother had directed her to give to Graham. As Molly approached Graham, Yellow and Red attacked the child, inflicting

---

[1] The dog accused of biting the meter reader was not involved in the attack on the child in the instant case.

multiple serious bites.  Julie heard Molly's screams, ran outside, and managed to rescue Molly from the dogs.  Graham was standing nearby but did not attempt to intervene, claiming she did not see the dogs bite Molly or hear the child's screams.  Molly suffered serious injuries, including lacerations and puncture wounds to both arms and her right leg.  She was transported via ambulance to St. Francis Medical Center in Monroe, Louisiana, where she underwent treatment for the dog bites.

Deputy Jonathan Bryan, of the RPSO, was dispatched to the scene. He encountered Julie, who described the dogs involved in the attack as a brown mixed-breed dog and a yellow mixed-breed dog.

The following day, Dustin King, Julie's husband, contacted the RPSO and reported that he had seen one of Graham's dogs, which he described as a "blonde" mixed breed, running around his yard without a leash.  By the time Deputy Bryan arrived, the dog had been returned to its kennel.  The deputy spoke to Graham, who admitted she had allowed one of her dogs outside without a leash to "use the restroom"; however, Graham denied allowing the dog to enter the neighbors' yard.  During her conversation with Deputy Bryan, Graham stated her brown and white dog was one of the dogs that attacked Molly the day before.[2]  Graham also told Deputy Brown that two of her dogs, Yellow and Red, were the only two dogs outside with her when Molly was bitten.  Subsequently, King, who was not present when the dogs bit Molly, pointed out the dogs he believed were involved.  Deputy Bryan

---

[2] During her testimony at the hearing, Graham stated she did not recall identifying the dog to Deputy Bryan.

noticed two dogs, a brown and white dog and a blond or yellow dog, were in kennels on Graham's property. The deputy took photographs of them.[3]

The RPSO issued a summons to Graham, citing her with unlawful ownership of dangerous dogs. Yellow and Red were seized, and Graham and her daughter drove them to a local veterinary clinic where they have been held since that time.

On January 27, 2025, the State of Louisiana, through the District Attorney for the Fifth Judicial District, filed a "Motion and Order for Seizing and to Set Hearing to Dispose of Vicious Dogs," pursuant to La. R.S. 14:102.18 and 14:102.13; Graham was named as the defendant. The State sought a declaration that the dogs were vicious and a determination "that when unprovoked and in an aggressive manner, ha[ve] inflicted bodily injury on a human being." The State also requested that the dogs be euthanized "because they are a threat to public safety." The trial court ordered Graham to appear and show cause why the dogs "should not be declared vicious and disposed of according to law."

A hearing was held on January 30, 2025. Following the hearing, the trial court declared the dogs to be dangerous dogs that were an immediate threat to public health and safety. More specifically, the court found that the State met its burden of proving the dogs were "dangerous dogs," as defined in La. R.S. 14:102.14, because, when unprovoked, they bit a person causing injury. The court stated as follows:

***
Counsel for Graham argues that the State must prove there was no provocation of the dogs by Molly and that no testimony was offered by the State to do so. The Court reads the wording of

_____
[3] It was later revealed that the blond/yellow dog that Deputy Bryan photographed was a different dog, Milo, which was not involved in the attack.

the statute differently. The wording "when unprovoked, in an aggressive manner" implies that it would be assumed that there would ha[ve] been no provocation to the dogs unless otherwise proven or implied from the circumstances.

The Court found no definition of "provocation" in the applicable statutes governing the prosecution of this matter. "Provocation" in its normal use of the word is defined as "an action or statement that is intended to make someone angry," "an action that is intended to cause a reaction, esp. anger or annoyance." *See Cambridge Dictionary*. Implicit in the term is the intent to cause a reaction. Graham, apparently the only eyewitness to the attack other than Molly herself, testified to no actions by Molly that could have reasonably been considered "provocative" as she approached just prior to the attack. There was no indication from Graham's testimony that Molly's actions in running towards Graham and her dogs were anything but normal childish actions which conceivably may have surprised the dogs, but nothing in the testimony or other evidence gives rise to an inference or any indication that Molly provoked the dogs in any way. The fact that the dogs attacked Molly without being provoked and bit her several times before her mother arrived at the scene clearly demonstrates to the Court that the dogs were acting "in an aggressive manner" as contemplated by the statute.

***

The trial court ordered the dogs to be "humanely euthanized" in

accordance with La. R.S. 14:102.16(C) and 102.18(D) and (E), stating:

[I]t is apparent to the Court that the two subject dogs, Yellow and Red, are not only dangerous dogs but that they pose an immediate threat to public safety and health: this is evident from the dogs act[ing] aggressively in attacking a child without provocation, along with the fact that their owner completely disregards the mandates of law in allowing these dogs to be unleashed and outside of a secure enclosure at the time of the attack and that she admittedly is physically unable to intervene to stop the dogs [if they] should attack a neighbor or member of the public. Unfortunately, Graham has demonstrated that she is unwilling to act responsibly while keeping these dogs on her premises, despite her having previously been found to be the owner of a dangerous dog while residing at the same property on which the attack in this case occurred. She has ignored the obvious need to keep her dogs inside her dwelling or within secure enclosures when found outside her dwelling. Although she admitted knowing that she would be unable to catch or control the dogs when they were loose, she was not responsible enough to even leash the dogs while they were outside her

4

dwelling or outside a secured enclosure in order to at least attempt to restrain them if needed.

***

[C]onsidering Graham has failed repeatedly to properly restrain or enclose her dogs to prevent them from attacking persons, especially children, living nearby or entering her property, the Court does not believe that she will follow any directives of the Court or comply with conditions the Court may establish for the restraint and confinement of the subject dogs as provided by law. For these reasons and for the reasons explained above, the Court finds that the subject dogs pose an immediate threat to public health and safety in accordance with the provisions of R.S. 14:102.16.

***

The trial court further cast Graham with all costs and expenses of keeping the dogs, including the expenses of euthanizing and properly disposing of them.

Graham appeals.

## DISCUSSION

Graham contends the trial court erred in finding that her dogs are dangerous dogs. She argues La. R.S. 14:102.14 defines a "dangerous dog" as a "any dog which, when unprovoked, bites a person causing an injury." More specifically, Graham takes issue with the trial court's use of a dictionary to define the term "provocation." According to Graham, the statute does not state the provocation must be intentional, and Molly could have unintentionally provoked the dogs by running toward Graham. She argues the trial court erred, as a matter of law, in interpreting the term "provoke" to mean an intentional act. Graham asserts she is entitled to a de novo review because the incorrect interpretation of the word tainted the entire proceeding.

A court of appeal may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Kinnett v.*

*Kinnett*, 20-01134 (La. 10/10/21), 332 So. 3d 1149.  However, where the trial court makes a legal error that interdicts the fact-finding process, the manifest error standard is no longer applicable, and the appellate court may conduct an independent de novo review of the record.  *Hicks v. USAA General Indem. Co*., 21-00840 (La. 3/25/22), 339 So. 3d 1106.  A legal error occurs when a trial court applies incorrect principles of law, and such errors are prejudicial.  *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731.  Generally, when the trial court makes errors that are prejudicial, such that they materially affect the outcome of the trial and deprive a party of substantial rights, and if the record is otherwise complete, the appellate court will conduct its own de novo review of the record.  *Melerine v. Tom's Marine & Salvage, LLC*, 20-00571 (La. 3/24/21), 315 So. 3d 806.

La. R.S. 14:3 provides:

> The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.

Further, as a general matter, criminal statutes are given a genuine construction according to the fair import of their words, taken in their usual sense, in context, and with reference to the purpose for the provision. La. R.S. 14:3; *State v. Interiano*, 03-1760 (La. 2/13/04), 868 So. 2d 9; *State v. Muschkat*, 96-2922 (La. 3/4/98), 706 So. 2d 432; *State v. Griffin,* 495 So. 2d 1306 (La. 1986).

A "dangerous dog" is defined as "any dog which, when unprovoked, bites a person causing an injury."  La. R.S. 14:102.14(A)(2).  However, the

6

statute does not define the terms "unprovoked," "provoked," or "provocation."

In *State v. Jenkins*, 338 So. 2d 276 (La. 1976), the defendant claimed he was prejudiced by the use of the dictionary definition of the word "threat." The Supreme Court rejected the argument, stating:

> We note, first of all, that unless the legislature has attached a particular meaning to a term different from that usually understood in common parlance the common definition of the word will be presumed to be the one intended. *State v. Saibold*, 213 La. 415, 34 So. 2d 909 (1948); *State v. Robertson*, 241 La. 249, 128 So. 2d 646 (1961). In these two cases, this Court looked to Webster's Dictionary to determine the common meaning of statutory language, and, absent special circumstances, we see nothing wrong with this method of interpreting laws.

*Id.* at 282.

Applying these principles to the instant case, we find the trial court did not apply incorrect principles of law or make any prejudicial errors of law. The trial court did not create a wholly new definition of the word but rather used the dictionary to ascertain the generally prevailing meaning of a common term. Consequently, we fail to see any legal error on the part of the trial court regarding its use of the dictionary definition of the term "provocation." In the absence of any legal error on the part of the trial court, we decline to conduct a de novo review of this matter. Therefore, we find the trial court's factual findings are subject to the manifest error standard of review.

Under the manifest error standard of review, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880 (La. 1993); *Cosse v. Allen-*

*Bradley Co.*, 601 So. 2d 1349 (La. 1992); *Housley v. Cerise*, 579 So. 2d 973 (La. 1991); *Sistler v. Liberty Mutual Ins. Co.*, 558 So. 2d 1106 (La. 1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Arceneaux v. Domingue*, 365 So. 2d 1330 (La. 1978).

However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. *Rosell*, *supra*. Nonetheless, the reviewing court must always keep in mind that if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Housley v. Cerise*, *supra*; *Sistler v. Liberty Mutual Ins. Co.*, *supra*.

A "dangerous dog" includes "[a]ny dog which, when unprovoked, bites a person causing an injury." La. R.S. 14:102.14(A)(2). In every case where a dog is established to be a dangerous dog, the court shall enter an order declaring the dog to be dangerous and shall direct the owner of the dog to comply with conditions established for the restraint and confinement of the dog as provided by law. La. R.S. 14:102.13(D). Alternatively, a dog determined by the court to be a dangerous dog may be humanely euthanized

8

if it is determined that the dog poses an immediate threat to public health and safety. La. R.S. 14:102.16(C).

Furthermore, La. R.S. 14:102.18 provides, in pertinent part:

A. Any law enforcement officer or animal control officer may seize any dog which when unprovoked, in an aggressive manner, causes the death of or inflicts bodily injury on a human being. Any dog seized pursuant to the provisions of this Section may be impounded pending the outcome of the hearing held in accordance with this Section.

\*\*\*

D. A dog determined by the court to have, when unprovoked, in an aggressive manner, caused the death of or inflicted bodily injury on a human being may be humanely euthanized by the animal control agency, a licensed veterinarian, or a qualified technician.

\*\*\*

In the instant case, Deputy Bryan testified that on January 22, 2025, he was dispatched to a property regarding a dog bite complaint. When he arrived, he encountered Molly's mother, Julie Smith, who told him she was inside her house when she heard Molly screaming. She ran outside, observed two of Graham's dogs attacking Molly, ran over and freed Molly from the dogs, and carried her inside. Deputy Bryan testified he observed lacerations underneath Molly's left armpit and on the back of her left arm and puncture wounds on her right leg and arm. Molly was transported to St. Francis Medical Center in Monroe via ambulance. Deputy Bryan further testified he determined Graham was the owner of the dogs involved in the attack, and he issued a summons to her for two counts of ownership of a vicious dog.

Additionally, Deputy Bryan stated he was dispatched back to Graham's property the following day for a report of one of her dogs running loose in the neighbor's yard. He also testified that Dustin King pointed out the two dogs he believed had bitten Molly. Deputy Bryan stated he

9

interviewed Graham, who admitted to letting one of her dogs out "to use the restroom" on her property, but she denied that the dog ventured onto King's property. Deputy Bryan also testified Graham informed him "it was the brown and white dog alone that attacked [Molly] the previous day."

Suzanne Smith, Graham's daughter, testified she lives near her mother, and she is familiar with her mother's dogs. Smith stated she had never seen Yellow or Red behave aggressively toward anyone, and her children had never been afraid of them. She also testified she took photographs of her mother's property the day before the hearing; the photographs depicted "Beware of Dog" signs displayed in various locations around the property.[4]

Melissa Overman, Suzanne Smith's best friend, testified that she visited Graham nearly every day, and she was familiar with the dogs, including Yellow and Red. She also stated Yellow and Red would bark when she arrived, but she had never witnessed them acting aggressively toward anyone. Overman testified the dogs were familiar with her, and she described their barks as "playful," but not vicious. She further testified Yellow generally stays in the house with Graham, but Graham lets her outside "to use the bathroom." Overman admitted that she had never observed Yellow being on a leash when Graham let her outside.

Graham testified that Red and Yellow were outside in the yard with her at the time of the attack, and she admitted they were not on leashes. She stated she was not in any condition to catch the dogs if they became excited

---

[4] Smith also identified her mother's dogs depicted in the photographs. One of the photographs, taken by Deputy Bryan the day after the attack, depicted a dog named "Milo," which looked similar to Yellow.

and "took off." She also testified she heard the dogs barking, but she did not see them bite Molly or hear Molly screaming. Graham insisted she "was there the whole time"; however, she claimed she did not know how Molly received the dog bites depicted in the photographs. She stated her dogs are not aggressive, Yellow and Red are "loving dogs," and she had never seen them bite or act aggressively toward anyone. Graham also testified that she did not believe Molly intentionally provoked the dogs, but she may have "scared" them by running across the yard. According to Graham, she could not recall identifying Yellow and Red as the dogs that attacked Molly.[5]

After Graham's testimony, the State called Deputy Jacob Stansbury to testify as a rebuttal witness. He testified he and another deputy were dispatched to Graham's property to seize and impound the dogs involved in the attack on Molly. He stated he and the other deputy did not know which dogs were to be seized when they arrived at the property. Therefore, they spoke to Graham and asked her which dogs were involved in the incident. Deputy Stansbury testified that Graham indicated which dogs were involved, and she and her daughter put the dogs into her vehicle and drove them to the veterinary clinic. When asked how the deputies knew which two dogs were to be seized and impounded, Deputy Stansbury replied as follows:

> Well, we just – we took *** Ms. [Graham's] account. We asked her, you know, which dogs [were involved]. Obviously, there [were] multiple dogs. Once – once she told us which dogs *** and we got them to Morris Vet, I captured two photos, one of each dog that was quarantined. And the pictures were shown to, I believe, the victim's mother. And the mother clarified that those were the dogs that in fact attacked her.

---

[5] Graham introduced exhibits, which showed she had kennels and several "Beware of Dog" signs on her property. One of the signs faced the property occupied by Molly's family.

Pursuant to R.S. 14:102.18, the State was required to prove (1) the dogs inflicted bodily injury or caused the death of a human being; (2) the dogs were unprovoked; and (3) the dogs inflicted the bodily injuries in an aggressive manner. Based on our review of the record, we find the evidence supports the trial court's conclusion that the dogs, Yellow and Red, in an aggressive manner, inflicted bodily injury on a human being, Molly. The trial court evaluated the evidence and concluded Molly did not provoke the dogs to bite her. There was no evidence that Molly, a child running to give Graham a requested cigarette from her mother, provoked the dogs to attack her, either intentionally or unintentionally. The dogs were in the yard, unleashed, at the time of the attack, and Graham admitted she habitually lets the dogs out into the yard without leashes. The evidence also established that despite the attack on Molly, Graham admitted that she had let at least one of her dogs outside, unleashed, the very next day to "use the restroom." In finding that the dogs pose an immediate threat to public health and safety and ordering them to be euthanized, the trial court appropriately considered Graham's total disregard of the prior mandate to keep her dogs leashed or in secure enclosures. The trial court stated:

***

[C]onsidering that Graham has failed repeatedly to properly restrain or enclose her dogs to prevent them from attacking persons, especially children, living nearby or entering her property, the Court does not believe that she will follow any directives of the Court or comply with conditions the Court may establish for the restraint and confinement of the subject dogs as provided by law. For these reasons, and for the reasons explained above, the Court finds that the subject dogs pose an immediate threat to public health and safety[.]

***

We agree. Consequently, we find the trial court's findings – the dogs, Yellow and Red, attacked Molly without provocation, and they inflicted

12

bodily injury on her in an aggressive manner – were not manifestly erroneous or clearly wrong. Additionally, considering the appropriate standard of review and the entirety of the record, we are constrained to conclude that the trial court did not manifestly err in finding that the dogs, Yellow and Red, pose an immediate threat to public health and safety and ordering them to be humanely euthanized.

Graham also argues the trial court erred in overruling her objections and allowing Deputy Bryan to render hearsay testimony as to what Molly's mother Julie, and her husband, Dustin King, told him during the investigation of the dogs' attack. She argues neither Julie nor King testified at the trial, and the testimony by Deputy Bryan was hearsay because it pertained to the central issue in this case.

The Code of Evidence shall serve as guides to the admissibility of evidence. In hearings on motions and other summary proceedings involving questions of fact not dispositive of or central to the disposition of the case on the merits, or to the dismissal of the case, the specific exclusionary rules of evidence and other provisions shall be applied only to the extent that they tend to promote the purposes of the proceeding. La. C.E. art. 1101(B)(8).

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible. La. C.E. art. 402.

"Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. La. C.E. art. 802. Whether evidence is relevant and admissible is within the discretion of the trial court, and its rulings will not be disturbed on appeal in the absence of a clear abuse of discretion. *Succession of Davisson*, 50,830 (La. App. 2 Cir. 12/22/16), 211 So. 3d 597, *writ denied*, 17-0307 (La. 4/7/17), 218 So. 3d 111; *Hooker v. Wal-Mart Stores, Inc.*, 38,244 (La. App. 2 Cir. 3/3/04), 867 So.2d 869.

When an investigating officer testifies concerning events which lead to the arrest of a defendant, or in this case, the issuance of a summons, statements made to the officer during the course of the investigation are not hearsay, if they are merely offered to explain the officer's actions. *State v. Clark*, 44,612 (La. App. 2 Cir. 9/23/09), 22 So. 3d 240; *State v. Zeigler,* 40,673 (La. App. 2 Cir. 1/25/06), 920 So. 2d 949. A trial court's error in admitting evidence of a testifying police officer, when such testimony arguably contains hearsay, is subject to the harmless error analysis. *Id*.

Our review of the record reveals Deputy Bryan testified that Molly's mother, Julie Smith, was the complainant on January 22, 2025, regarding the dog attack, and Dustin King was the complainant on January 23, 2025, regarding one of Graham's dogs running in his yard. Over the objections of Graham's counsel, Deputy Bryan was allowed to testify about his conversations with Julie and King and their recount of events. His testimony explained his understanding of the occurrences which transpired and his subsequent investigation of both complaints, including his interactions with

14

Graham. Deputy Bryan did not testify to the veracity of what Julie and King told him. Rather, much of his testimony focused on the actions he took in response to the information they provided, *i.e.*, interviewing Graham and subsequently issuing a summons. Based on the facts and circumstances herein, we find the trial court did not err in denying the hearsay objections to Deputy Bryan's testimony.

Nevertheless, even if the trial court erred in allowing the testimony, reversal is mandated only when there is a reasonable possibility that the hearsay evidence surely contributed to the trial court's ruling. In this case, our review of the record shows the evidence was sufficient to support the trial court's ruling, even without consideration of the deputy's testimony as to the statements made by Julie and King. Even without the benefit of the statements, the evidence established Yellow and Red attacked Molly, biting her multiple times. Deputy Bryan saw and photographed Molly's injuries. Further, Graham, who denied witnessing the attack, later admitted to Deputy Bryan that at least one of her dogs (subsequently identified as Red) was involved. Graham also identified which dogs were in the yard with her at the time of the attack, and she and her daughter transported the dogs to the veterinary clinic. Consequently, we conclude any error in allowing Deputy Bryan's testimony, regarding statements made by Julie and King, was harmless.

**CONCLUSION**

For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to appellant, Susan Graham.

**AFFIRMED.**